```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,          : Docket #22cr352

                    Plaintiff,     :

   - against -                     :

SMITH,                             : New York, New York
                                     June 28, 2022
                    Defendant.     :

------------------------------------ :


                        PROCEEDINGS BEFORE
                  THE HONORABLE STEWART D. AARON
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:           UNITED STATES ATTORNEY'S OFFICE
                         BY:  ADAM HOBSON, ESQ.
                              RUSHMI BHASKARAN, ESQ.
                         One St. Andrew's Plaza
                         New York, New York 10007


For Defendant:           LAW OFFICE OF ANTHONY CECUTTI
                         BY:  ANTHONY CECUTTI, ESQ.
                         217 Broadway, Suite 707
                         New York, New York 10007
```

```
Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1                              PROCEEDINGS                    3

2               THE CLERK:  This is in the matter of US versus

3    Sequan Jackson, docket number 22cr352.  Counsel, please

4    state your appearance for the record starting with the

5    Government.

6               MR. ADAM HOBSON:  Good afternoon, Your Honor,

7    Adam Hobson and Rushmi Bhaskaran for the Government

8               MR. ANTHONY CECUTTI:  Good afternoon, Your

9    Honor, Anthony Cecutti for Sequan Jackson.

10              HONORABLE STEWART D. AARON (THE COURT):  Good

11   afternoon.  May I please have the date and time of arrest?

12              MR. HOBSON:  Yes, the defendant was arrested

13   this morning at approximately 6 a.m.

14              THE COURT:  Mr. Jackson, I am Magistrate Judge

15   Aaron.  You are here because you're charged with certain

16   crimes by an indictment. The purpose of today's proceeding

17   is to advise you of certain rights you have, inform you of

18   the charges against you, consider whether counsel should

19   be appointed for you and decide under what conditions, if

20   any, you should be released pending trial.

21              Now to explain certain constitutional rights

22   that you have.  You have the right to remain silent, you

23   are not required to make any statements.  Even if you're

24   already made statements to the authorities you do not need

25   to make any further statements.  Any statements you do

```
1                          PROCEEDINGS                   4
```

2    make can be used against you.

3           You have the right to be released either

4    conditionally or unconditionally pending trial unless I

5    find there are no conditions that would reasonably assure

6    your presence at future court appearances and the safety

7    of the community.

8           If you are not a United States citizen you have

9    the right to request that a Government attorney or law

10   enforcement official notify a consular officer from your

11   country of origin that you've been arrested. In some cases

12   a treaty or other agreement may require the United States

13   Government to give that notice whether you request it or

14   not.

15          You have the right to be represented by an

16   attorney during all court proceedings, including this one,

17   and during all questioning by the authorities.  You have

18   the right to hire your own attorney. If you cannot afford

19   an attorney I will appoint one today to represent you.

20          Do you understand your rights as I've just

21   explained them?

22          THE DEFENDANT:  Yes.

23          THE COURT:  All right.  So I've been provided a

24   financial affidavit that bears your signature that

25   indicates you wish for me to appoint Mr. Cecutti as your

```
 1                         PROCEEDINGS               5

 2  counsel, am I correct?

 3           THE DEFENDANT:  Yes.

 4           THE COURT:  If I could ask you to please raise

 5  your right hand.  Do you swear that the contents of this

 6  affidavit are true and correct so help you God?

 7           THE DEFENDANT:  yes.

 8           THE COURT:  All right, based upon the contents

 9  of the affidavit I am approving the appointment of Mr.

10  Cecutti as your counsel and I've signed the document to

11  reflect that.

12           The document that contains the charges against

13  you is an indictment issued by a grand jury here in the

14  Southern District of New York.  Mr. Cecutti, have you had

15  an opportunity to review the charges in the indictment

16  with your client?

17           MR. CECUTTI:  We have had that opportunity, Your

18  Honor, and discussed the charges, as well.

19           THE COURT:  And do you waive its public

20  reading?

21           MR. CECUTTI:  Yes, Your Honor.

22           THE COURT:  And Judge Rakoff has referred this

23  matter to me for purposes of arraignment, what plea

24  does your client enter?

25           MR. CECUTTI:  Not guilty.
```

```
 1                        PROCEEDINGS                    6
 2              THE COURT:  All right, I'm going to indicate
 3   on the disposition sheet that the defendant's been
 4   arraigned and enters a plea of not guilty.
 5              Because this may be considered the first scheduled
 6   appearance in this matter, I direct the prosecution to deal
 7   with its obligation under Brady against Maryland and its
 8   Progeny to disclose to the defense all information, whether
 9   admissible or not, that is favorable to the defendant,
10   material either to guilt or to punishment and known to the
11   prosecution. Possible consequences for noncompliance may
12   include dismissal of individual charges or the entire case,
13   exclusion of evidence or professional discipline or court
14   sanctions on the attorneys responsible. I will be entering a
15   written order more fully describing this obligation and the
16   possible consequence of failing to meet it and I direct the
17   prosecution to review and to comply with that order. Does
18   the prosecution confirm that it understands its obligations
19   and will fulfill them?
20              MR. HOBSON:  yes, Your Honor.
21              THE COURT:  All right, I'll next hear from the
22   Government with respect to its position on bail,
23   detention or release.
24              MR. HOBSON:  Your Honor, the Government seeks
25   detention.
```

```
 1                          PROCEEDINGS              7
 2          THE COURT:  And what are your intentions in
 3  that regard, Mr. Cecutti?
 4          MR. CECUTTI:  To make an application for
 5  release, Your Honor.
 6          THE COURT:  All right, so the way we're going
 7  to proceed is I'll first hear from Mr. Hobson on
 8  behalf of the Government for his reasons seeking
 9  detention and then I'll hear from Mr. Cecutti.
10          MR. HOBSON:  Your Honor, the Governments seeks
11  detention both based on danger to the community and
12  risk of flight. I know the Court is familiar with this
13  enterprise and the violent nature of the enterprise by
14  now, it's, of course, set forth in the bail letter
15  that's before the Court which the defense and defense
16  counsel has, so I won't repeat all those arguments
17  here, but I will focus on this defendant's particular
18  role in the enterprise.
19          This defendant is probably, well is of the
20  defendants the Court has seen today the highest ranking
21  member of the enterprise. He's, we would characterize him as
22  the number two. He was Jatiek Smith's lieutenant, his right-
23  hand man, he ran the operation in Jatiek's absence, he was
24  intimately involved in all the aspects of this operation. In
25  fact, it was the defendant who was, who had been working at
```

```
 1                            PROCEEDINGS                    8
 2  First Response when First Response was a legitimate company
 3  and then brought Tiek into the company. The two of them then
 4  worked together to take control of the company and to exert,
 5  use that company to exert control over the industry.
 6          The wire calls, the witness statements and other
 7  phone interceptions in this case have shown the defendant
 8  directing the rotation system, running the operation in
 9  general and giving orders to the other defendants who the
10  Court has seen today such as Mr. McGee, Mr. Small, Mr.
11  Pereira.
12          He's been, he orders violence. We talked about the
13  kind of violence that this crew carries out.  The defendant,
14  himself, was one of the ones who orchestrated that violence
15  and ordered others to commit violence.  One of the incidents
16  that we spoke about with Mr. Dore was an incident in October
17  of 2021 in which Mr. Dore and other members of First
18  Response assaulted a construction worker at one of the jobs
19  that First Response was overseeing.
20          And we know this because we were up on Mr.
21  Jackson's phone at the time on a wire and you could
22  hear him giving directions to Mr. Dore to go and
23  assault this construction worker. And you could hear
24  Mr. Dore taking him there in real time as Mr. Jackson
25  continued to give directions. We know that in that
```

1                          PROCEEDINGS                    9

2  assault not only was this man punched while, you know,

3  innocently working at a house, doing his job at this

4  fire sight, not only was this man punched but his ID

5  card was stolen and they took a picture of it to get

6  his address, an obvious threat to this man not to, not

7  to mess with them.

8              There's also a video circulating of Mr.

9  Jackson, himself, carrying out an assault while

10 wearing his red First Response Outfit and attacking

11 another individual.

12             THE COURT:  When was that?

13             MR. HOBSON:  The video was found on a phone in

14 September of 2020, the video was undated as far as I

15 know. So we don't have much more information about the

16 motive of that particular assault but it is this

17 defendant carrying out an assault.

18             THE COURT:  And you mentioned something about

19 what he was wearing?

20             MR. HOBSON:  He was wearing a red first

21 response outfit similar to the one he's wearing right

22 now.

23             THE COURT:  Got it.

24             MR. HOBSON:  We've noted that the First

25 Response enterprise has also been involved in witness,

```
 1                        PROCEEDINGS              10
```

```
 2  witness tampering and threats against witnesses,

 3  especially after November, 2021, when they became

 4  aware of this investigation. The defendant has been

 5  part of that --

 6            THE COURT:  How did they become aware of the

 7  investigation?

 8            MR. HOBSON:  Your Honor, I believe that they

 9  learned that people were being subpoenaed by the, by

10  the Federal Government.  Obviously, this investigation

11  involved talking to numerous members of the fire

12  mitigation industry and the public adjuster community

13  and it appears that word got out. It's pretty

14  undisputed that they knew that they were being

15  investigated and yet carried on their crimes while

16  also increasing their threats against others.

17            One thing that I know is not part of the

18  information that Pretrial had in making their

19  recommendation is what happened today at this

20  defendant's arrest.  This defendant was arrested at the home

21  he now lives in which, as Ms. Bhaskaran previously is a home

22  owned by co-defendant Octavio Peralta and, until a few weeks

23  ago, primarily occupied by Jatiek Smith.  Under a, when we

24  attempted to arrest Mr. Jackson, he tried to flee out the

25  window which I think alone shows a determination to flee and
```

```
 1                          PROCEEDINGS              11
 2   a risk of flight.  Under his bed was a safe which contained
 3   two firearms, one was loaded and one had an extended
 4   magazine next to the firearm. His passport was also in that
 5   safe. Obviously, we've talked about the evidence the members
 6   of First Response had guns, we've talked about the other
 7   guns that were found in the First Response offices and we've
 8   talked about how some of these assaults First Response
 9   members were seen with guns, this evidence today shows that
10   Mr. Jackson, himself, owned, personally had firearms. Of
11   course, he was not legally allowed to have those firearms
12   because he has a long list of felony convictions, including
13   very serious felonies such as assault, armed robbery and
14   weapons possession.
15          His rap sheet goes back to age 16, it includes
16   bench warrants which is a further reason to worry about his
17   risk of nonappearance. And I'll note that just a few weeks
18   ago he was arrested for grand larceny, that arrest occurred
19   along with co-defendant Jatiek Smith. My understanding is
20   both of them were arrested while attempting to steal several
21   thousand dollars worth of merchandise from a Home Depot
22   store.
23          Your Honor, given this defendant's high rank in
24   the enterprise, given his involvement in the violence, given
25   his attempts to flee today, given his demonstration
```

1                          PROCEEDINGS              12

2  possession of firearms, given his long history of breaking

3  the law we submit that detention is appropriate here.

4          THE COURT:  Let me hear from you, please, Mr.

5  Cecutti.

6          MR. CECUTTI:  Thank you, Your Honor.  Obviously,

7  today we are not here to try the case. I don't have

8  any discovery, these are allegations, and with respect

9  to the content of intercepted calls I don't believe

10 the Court can rely on that unless I have been provided

11 with transcripts or the actual audio recordings,

12 themselves.

13         The question before the Court is whether or

14 not there are a set of conditions, and the Court is

15 well aware of that crucial question, and Pretrial

16 Services has addressed that question, they did a

17 thorough investigation. They obviously interviewed Mr.

18 Jackson and they also interviewed his girlfriend who

19 is also present and she's raising her hand.  And they

20 made a determination that despite the, the nature of

21 the charges and his criminal history and other things

22 that the Government has pointed out to Your Honor this

23 afternoon and this evening that he is a candidate for

24 release and an individual that is bailable pursuant to

25 a robust set of conditions which are before the Court.

| | PROCEEDINGS | 13 |
|---|---|---|

1

2          And we would certainly be onboard with the

3 conditions that Pretrial has recommended and I'll

4 highlight just a few. A bond cosigned by three

5 financially responsible persons.  We have in Mr.

6 Jackson's family a mother, an aunt, a girlfriend and

7 perhaps other family members that fit that criteria.

8 His aunt does have a property in Virginia that could

9 also be included in any package.  Another highlight

10 would be that he would be on home detention enforced

11 by location monitoring.

12          This is critical, Your Honor, that Mr. Jackson

13 be released and here's the bottom line. Mr. Jackson

14 has two children, they're both young, a nine year old

15 and a two year old. His girlfriend is unemployed and

16 that's because approximately a week and a half ago she

17 was shot and she's recovering and is unable to go back

18 to work. He was also present and was injured as well

19 but he's been the primary person taking care of the

20 family. And the realty of this, Your Honor, is that if

21 he is detained there is no income for the family. And

22 Mr. Jackson not only supports now his girlfriend and

23 two young children, he also supports her mother as

24 well. So there's several people that he is financially

25 responsible for himself and he will lose everything if

1                        PROCEEDINGS                    14

2  he is detained.

3          He is presumed innocent. Obviously the

4  allegations here are serious but, again, we're not

5  here to try the case. I haven't reviewed any of the

6  evidence to support what the Government has said in

7  their letter or this afternoon and this evening with

8  respect to the case against Mr. Jackson.

9          He is 33 years old, he's a longtime resident

10 of Staten Island. He was born in the Bronx and he was

11 raised in Staten Island. He has other family that

12 lives in Staten Island that are in close proximity to

13 him. He has been gainfully employed since the age of

14 21. The Government pointed out that he has a lengthy

15 criminal history and I think it's important to, to

16 examine the criminal history.  He did have some

17 trouble when he was a teenager, when he was 16-17

18 years old, he was released after serving 3-1/2 years

19 at the age of 21, and I think it's important to look at

20 his conduct from age 21 to 33 when he was released.

21         And during that time period he's had two

22 contacts with the criminal legal system, one that included

23 a misdemeanor assault and in that matter he appeared every

24 single time he was required to, no bench warrants, and the

25 outcome of that case was a conditional discharge in which

```
1                        PROCEEDINGS              15
```

2  he had to abide by an order of protection. He did so

3  during the pendency of that case and after that case.

4         The Government pointed out that he was recently

5  arrested on June 4th.  He contests his guilt, that is a

6  false arrest, Home Depot is a place that he goes to quite

7  frequently and I think it's important to note that he was

8  given a desk appearance ticket in that case.  In other

9  words, he was arrested, he was brought to a precinct and

10 law enforcement made a determination that he could be

11 released and come back to Court for an arraignment and any

12 subsequent appearances, and that's exactly what he has

13 done.

14        So again, Your Honor, from the age of 21 to 33

15 he has been gainfully employed, he's worked

16 continuously, he no longer works for First Response, I

17 think that is also very important, he works for a

18 company that he started called Juniors Board Up and

19 that is the way that he supports himself and supports

20 his family.

21        I understand that this morning there was a

22 search done pursuant to his arrest and that there were

23 guns that were recovered. Those guns were found in the

24 residence, they were, however, found inside a locked

25 safe and I think there is dispute whether or not they

1                          PROCEEDINGS                 16

2   were loaded but the bottom line is they were in a

3   locked safe and Mr. Jackson and, again, his girlfriend

4   were a victim of a shooting, he didn't have them for

5   any intention of doing harm to anybody else, but he

6   had moved into this residence, new home, new

7   neighborhood in fear of any kind of retaliation

8   related to this shooting, and kept them in a safe

9   manner.

10          He did not flee, he never tried to flee, what

11  happened was he --

12          THE COURT:  Isn't it unlawful for him to

13  possess those firearms since he's a, has a felony

14  conviction?

15          MR. CECUTTI:  I don't know if I'm prepared to

16  say that, Your Honor, but I understand that would be

17  an issue that the Court would have concern about so

18  I'm trying to address why, in fact, he may have had

19  them.

20          THE COURT:  Okay.

21          MR. CECUTTI:  Law enforcement has claimed that

22  he attempted to flee, but he never made an attempt to

23  flee.  He was startled by the commotion at 6 a.m. of

24  law enforcement trying to execute an arrest warrant, I

25  believe a search warrant at the residence. He pushed a

```
 1                    PROCEEDINGS              17
 2  mesh gate or a mesh portion of a window to try and
 3  figure out what was going on. If law enforcement
 4  interpret that as he was trying to flee, he was not
 5  attempting to flee, he was merely trying to understand
 6  what was happening at 6:00 this morning when there was
 7  a lot of commotion occurring as a result of the
 8  warrant being executed.
 9           Again, Your Honor, I don't think I can stress
10  enough Mr. Jackson is the sole provider for his
11  family, we have two young kids, we do have financially
12  responsible persons that can cosign the bond, we do
13  have a property and if he were to be detained
14  throughout the pendency of this case there would be
15  disastrous consequences for other people that have not
16  been accused of anything in terms of wrongdoing,
17  especially the children here.
18           So I think that Pretrial Services got it right
19  and they do recommend a robust set of conditions and
20  those conditions in my view, Your Honor, will
21  reasonably assure that he will be in court every
22  single time he's supposed to be here and that there
23  will not be any safety concerns for the community.
24           THE COURT:  Mr. Hobson?
25           MR. HOBSON:  Yes, Your Honor, I'd like to
```

1                        PROCEEDINGS                    18

2   address some of those arguments.  First of all, and

3   we've heard this from some other defendants, too, this

4   idea that people no longer work at First Response. I

5   want to clarify that First Response was a company, a

6   legitimate company, but the defendant and his co-

7   defendants took it over.  And the First Response that's

8   alleged in the indictment is the First Response enterprise

9   which includes this group of people that operated under,

10  under the name of First Response at times but includes much

11  more than just employees of First Response. And, in fact,

12  Juniors Board Up, the company that this defendant claims to

13  work for, is part of that enterprise and part of the scheme.

14          Juniors Board Up is a board up company or they,

15  the EMS company will hire to board up the fire after fire

16  damage, and what the First Response enterprise does is force

17  other companies to use this defendant's company, Juniors

18  Board Up Company, as a way to funnel payments in and enrich

19  the enterprise. So it is part and parcel of this overall

20  scheme of extortion that they're carrying out.

21          The shooting that occurred a few weeks ago and the

22  purported explanation that that's why he had the guns, I

23  want to give the Court a little more information about that

24  shooting because we actually have some information

25  about the shooting. It occurred I believe on the

1                          PROCEEDINGS                    19

2    evening of June 19th which was Father's Day and it

3    occurred at Jatiek Smith's house.  Jatiek Smith was having a

4    party which included the defendant and several other members

5    of the First Response enterprise. Our understanding of what

6    happened is that fireworks went off on the sidewalk, someone

7    thought he was being shot at and had a gun and fired his

8    gun. The person he fired the gun at thought he was being

9    shot at and fired his gun. This was friendly fire between

10   two people at the party shooting and I believe that it's

11   correct that Mr. Jackson's girlfriend was hit in the

12   process. But there's no reason to think that this incident

13   would create an ongoing threat that would require him to

14   have guns, what I think it shows is that First Response and

15   the defendant and his co-defendants are all carrying guns,

16   they're all at parties where, they're at a party where

17   multiple people are having guns and just bring them out and

18   start shooting at each other.

19        THE COURT:  So Mr. Cecutti suggested it was a

20   dispute as to whether the guns were loaded, were the guns,

21   were either of the guns located loaded?

22        MR. HOBSON:  One gun was loaded, one had an extra-

23   long magazine next to the gun so that it could easily be

24   loaded. There's no dispute that the guns were loaded.

25   There's also I don't think --

1                         PROCEEDINGS              20

2              THE COURT:  Mr. Cecutti, do you dispute that, I

3    mean the Government has an obligation to be truthful to the

4    Court, they're not allowed to misrepresent or they will be

5    fired and brought up on ethics charges, so do you dispute

6    those guns were loaded?

7              MR. CECUTTI:  I think the point that I'm trying to

8    make, Your Honor, is that those guns were in a locked

9    box --

10             THE COURT:  Okay, but loaded and there was a

11   magazine next to another one?

12             MR. CECUTTI:  Right.

13             THE COURT:  Okay.

14             MR. CECUTTI:  And so the, so the --

15             THE COURT:  So you're not disputing it? I

16   heard your argument but you had suggested there was a

17   dispute as to whether the guns were loaded, unless I

18   misheard, we can't go back and get the transcript.

19             MR. CECUTTI:  My client is not certain whether

20   a gun was loaded, he does not believe so. But if law

21   enforcement sees the weapons, they open the safe,

22   we're not contesting what their ultimate finding was.

23             THE COURT:  Okay.

24             MR. CECUTTI:  But my point is --

25             THE COURT:  I got your point, he had them to

1                              PROCEEDINGS              21

2   protect himself and his girlfriend.

3            MR. CECUTTI:  And kept them in a safe manner,

4   that's the point.

5            THE COURT:  Understood.  Sorry for

6   interrupting you, Mr. Hobson.

7            MR. HOBSON:  And guns that he certainly was

8   not legally allowed to have given his numerous prior

9   felony convictions.

10           The one thing that I failed to mention earlier

11  was that the defendant is a member of The Bloods gang

12  and as are many of his co-defendants here, which is I

13  think another reason for concern about his danger.

14  And, in fact, Bloods literature was found in the

15  house. The Bloods, like many formal street gangs, have

16  official codes, sort of a bible of the rules and the

17  sayings and one of those was found in the defendant's

18  house.

19           As for Pretrial's recommendation, I would just

20  respectfully note that there are a number of factors that

21  the Court considers and that we consider in making our

22  recommendations that Pretrial I believe does not consider,

23  one of those is the strength of the evidence here. And the

24  strength of the evidence is strong, it includes numerous

25  witness statements, it includes wire transcripts of this

PROCEEDINGS                    22

1

2  defendant, it includes phones that we've seized which show

3  communications between this defendant and others, it is a

4  very, very strong case that has been built after over a year

5  of investigation.

6          In addition, Pretrial did not have evidence of

7  what was found in the house today including the two guns.

8  Pretrial did not have evidence of his attempt to escape

9  today. And I would submit that my understanding of what

10 happened is that the defendant had pushed a hole in this

11 screen of the window and he was trying to get out of it. I

12 don't think that's consistent with looking out the window

13 and trying to see what's going on. So I think it is a, it is

14 a reasonable assumption that he was trying to flee. So

15 Pretrial did not have all of this evidence when making their

16 recommendation. And I would submit that the recommendation

17 is simply wrong here.  The risk of danger is too great, the

18 risk of flight is too great.

19          THE COURT:  All right, I'm going to take a brief

20 recess, I'll ask Pretrial Services to come with me in the

21 back, I'll be out briefly.

22          THE CLERK:  All rise.

23           (PAUSE IN PROCEEDING)

24          THE COURT:  Mr. Jackson, I'm required under the

25 law to release you either with or without conditions imposed

PROCEEDINGS                 23

1

2   unless I determine that there are no conditions that will

3   reasonably assure your appearance in court as required and

4   the safety of the community. In making a bail determination

5   I'm required to consider the following factors, the nature

6   and circumstance of the offense charged, the weight of the

7   evidence against you, your history and characteristics and

8   the nature and seriousness of the danger to any person

9   or the community that would be posed by your release.

10  The Government ultimately bears the burden of

11  establishing by clear and convincing evidence that you

12  are a danger to the community or that you, by a

13  preponderance of the evidence, that you were a flight

14  risk.

15          I've heard arguments of counsel, I've

16  obviously read the Pretrial Services Report, but I do

17  find the Government has met its burden in this case

18  for several reasons. I think the evidence is strong,

19  hat the wiretaps, your high rank in the enterprise,

20  something that Pretrial Services doesn't, they don't

21  consider the allegations of the indictment, but most

22  importantly, loaded guns in circumstances where you're

23  a felon, that's a separate crime that can be

24  separately charged. So I do find that there are no

25  conditions I can impose that will reasonably assure

```
 1                          PROCEEDINGS              24
 2  the safety of the community.
 3          This is Judge Rakoff's case and there's a
 4  conference before him on July the 5th and, Mr. Cecutti,
 5  you are obviously free to appeal to Judge Rakoff at
 6  any time prior to July the 5th or on July the 5th if
 7  you believe that my determination is erroneous.  So
 8  I'm going to order the, Mr. Jackson detained. There's
 9  a conference before Judge Rakoff on July the 5th at
10  3:15 and pursuant to prior proceedings we've had, time
11  is excluded under the Speedy Trial Act until July the
12  5th.
13          Is there anything else that either side would
14  like to raise?
15          MR. HOBSON:  No, Your Honor.
16          MR. CECUTTI:  No, Your Honor, thank you.
17          THE COURT:  All right, thank you, this matter
18  is adjourned.
19                  (Whereupon, the matter is adjourned.)
20
21
22
23
24
25
```

25

## C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of United States of America versus Smith, Docket #22cr352, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature *Carole Ludwig*

                    Carole Ludwig

Date:    August 16, 2022