UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

    v.                                              22-cr-352 (JSR)

SEQUAN JACKSON,
                       Defendant.
-------------------------------------------------------x

## APPEAL FROM THE MAGISTRATE JUDGE'S DENIAL OF BAIL

This memorandum is respectfully submitted in support of SEQUAN JACKSON'S appeal of the detention order entered by the Hon. Stewart D. Aaron, U.S.M.J. on June 28, 2022.

## PROCEDURAL HISTORY AND NATURE OF THE CHARGES

Sequan Jackson has been charged, along with others, in a two-count indictment alleging a racketeering conspiracy and an extortion conspiracy. The charges arise from alleged activities of the First Response Cleaning Corporation, a fire damage remediation firm, by whom he was employed. The indictment alleges that owners and employees of First Response conspired to control the fire damage remediation business in certain areas of the Bronx by imposing a system of rotating responses to fire damaged sites among the companies. It is further alleged that the defendants used violence and threats of violence against other companies and insurance adjusters competing against First Response for business. In its detention memo, [Ex. A], the government alleges that co-defendant Jatiek Smith "effectively assumed control" over all aspects of First Response's business. The government goes on to characterize Mr. Jackson as Smith's "lieutenant" and that collectively, they

were the leaders of the enterprise. The government alleges that Jackosn threatened violence or directed other First Response member to threaten violence or engage in violence in order to impose the Enterprises rules on the fire restoration industry. Exhibit A at p. 4.

That said, counsel submits, respectfully, that there exists a combination of conditions that would protect the community and guard against any risk of flight that the defendant might pose.

## APPLICABLE LAW

In ordering Jackson's detention, Magistrate Judge Aaron principally relied heavily upon the allegations of violence and threats of violence alleged in the indictment and his prior criminal history. However, the Bail Reform Act ("BRA") does not require defendants to be detained pretrial simply because of their history; nor does it presume detention in a case such as this one. See 18 U.S.C. § 3142(e).

As relevant in this case, the government bears the burden of establishing by a preponderance of the evidence that an individual presents an actual risk of flight and that there are no conditions or combination of conditions that would assure that individual's presence in court. *United States v. Sabhnani*, 493F.3d 63, 75 (2d Cir. 2007). Indeed, the Second Circuit has described the BRA as reflecting "recognition that there is a small but identifiable group of particularly dangerous individuals as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985); accord, *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (only a limited group of defendants should be detained pending trial).

To obtain an order of pretrial detention on the basis of dangerousness, the government must demonstrate by clear and convincing evidence that a defendant poses a risk of danger to others, and that no conditions "will reasonably assure ... the safety of the community." *Chimurenga,* 760 F.2d at 405. Thus, a detention order must be supported by evidence that provides "a high degree of certainty" as to danger. *Id.* To detain a defendant as a risk of flight, a court must determine by a preponderance of the evidence that the defendant "presents a risk of flight if not detained," and that no set of conditions "reasonably will assure the presence of the defendant at trial if he is released." *Shakur,* 817 F .2d at 194-95.

## CONDITIONS AT THE MDC

Putting aside the well-documented and horrific conditions that have existed at the MDC, before, during and since the height of the pandemic, the ability of counsel to effectively prepare for trial with a client, whether in person at the MDC – or by video ("VTC") – or telephone ("TC"), decreases logarithmically by the day. Counsel are routinely turned away after hours of waiting, for reasons that the guards make up as they go along. Moreover, given the current level of violence at the MDC and the staff shortage attributed to, among other things, the prison guards' refusal to be vaccinated – successfully connecting with a client at the MDC has become something of a pipe dream. And, while VTCs and TC have offered an attractive alternative to in-person visits, of late, scheduled VTCs are often turned into TCs – which are often canceled, with no notice and no explanation. Indeed, last week counsel waited for 40 minutes before surrendering the belief that Mr. Jackson might yet be produced for a VTC or TC.

Counsel's experience is not unique; however, with a trial date fast approaching – *and much of the discovery not yet even produced* – time is of

the essence, and relying on the MDC's ability to connect counsel and client is a fool's folly. The newest MDC "accommodation" permitting counsel to bring a laptop into the facility to enable the effective review of discovery with clients was not honored. Indeed, our attempt to follow the protocol set forth by the MDC resulted, initially, in counsel receiving no response whatsoever from the BOP legal department and later, being turned away during an attempt to bring the now "authorized" electronic equipment into the facility.[1]

On October 3, 2022, counsel scheduled a VTC to review discovery with Mr. Jackson, who was never produced. MDC provided no reason for the non-production. On October 6, 2022, due to the fast approaching trial date, counsel changed tack and requested the newest MDC form authorizing use of a laptop during a legal visit. This proved both frustrating and unproductive. Counsel then visited Mr. Jackson in-person on October 7, 2022 — carrying printed copies of a fraction of the over six hundred and fifty-seven (657) gigabytes of discovery produced in this matter – to date. Importantly, counsel was not able to share any of the digital media provided by the government – which includes recorded conversations, body cam recordings, aerial photographs, video recordings and jail call recordings, among other materials – all of which will be central to the government's case-in-chief.

More recently, when counsel requested the laptop authorization form for our next visit. MDC staff indicated that the form was available by emailing "BOP Legal." On October 9, 2022 counsel re-requested this form from "BOP Legal" and received the following response: "[t]he forms are in the front lobby." Counsel replied, explaining that MDC staff indicated that the form needed to be obtained from BOP Legal. And so it goes at the MDC.

---

[1] Counsel was finally permitted to enter the facility with a computer device, after several days of confusion, incompetence and a complete lack of cooperation by the institution.

Most recently, on October 11, 2022 counsel had a scheduled VTC at 12:30 with Mr. Jackson to review digital discovery. At 12:37 that day, MDC called counsel indicating that MDC was not able to connect to the VTC platform. Counsel elected to have a TC in lieu of the VTC, even though it was not possible to conduct a meaningful review of discovery by telephone. All of this is a very long-winded way of providing the Court with a view of the futility of attempting to properly prepare Mr. Jackson for trial – and the MDC's commitment to thwarting every attempt by counsel to do so.

In a case such as this – where the extreme volume of discovery is compounded by the difficulty of connecting with the client – and a fast approaching trial date – counsel submits, respectfully, that releasing Mr. Jackson, on a personal recognizance bond, secured by the signatures of six financially responsible individuals – will provide the Court with the guarantees required to protect the community.

### PROPOSED CONDITIONS OF RELEASE

In light of the availability of the SDNY's Location Monitoring Program, defendants can be released from custody according to the terms of "home detention." This accommodation requires individuals to remain at home at all times except for limited and carefully circumscribed reasons, as ordered by the Court – including pre-approved and scheduled appearances in court, attorney visits, employment, education, medical necessities, religious activities, etc.). Alternatively, the Court can order "home incarceration" (24-hour-a-day lock-down) except for medical necessities, counsel visits and court appearances or other limited court-approved activities). http://probation.nysd.uscourts.gov/location-monitoring-program. Both options can be accompanied by electronic monitoring and/or GPS monitoring. *Id.*

If your Honor were to order Mr. Jackson released on "home detention" or "home incarceration" – Mr. Jackson is in the fortunate position of being able to secure such a bond with the signatures of six financially responsible individuals – all of whom enjoy a personal relationship with the client. Counsel has explained to all potential co-signers the risks to them financially, were Mr. Jackson to fail to appear in court or violate any of the conditions of his bond. These individuals have assured counsel that each is willing to assume a significant financial risk because they believe that Mr. Jackson will abide by all of the terms of such a bond. Additionally, no one can discount the degree of moral suasion inherent in the risk associated with such an undertaking.

The individuals who are ready, willing and able to affix their signatures to a personal recognizance bond include his girlfriend, Gwendolyn Rainel Hunter, who works as a customer service representative at Home Depot; his mother, Tricia Ford, who works as a Mental Health Therapy Aid; his stepdad, Louis Ford, who works as a dietary aid at New Vanerbuilt Rehab and Care Center; his friend since childhood, Kera Maye, who works as a registered nurse; his aunt, Tameeka Johnson, who owns a hair salon; and a friend, Sheneikia Young, who works at North Shore/LIJ.[2] Finally, Mr. Jackson has a job offer, pending his release, which would be a considerable help to his family. The job offer is memorialized in a letter from Andrew Ortega, from Tune It Up Auto. The letter is attached as Exhibit B.

---

[2] Each of these willing co-signers has provided counsel with copies of pay stubs, W-2's and work or other government issued identifications.

## CONCLUSION

Based upon the forgoing, it is respectfully submitted that the Government cannot establish by clear and convincing evidence that there are no conditions or combination of conditions which would protect the community nor can it establish by a preponderance of evidence that there are no conditions which can assure his appearance. Thus, we urge your Honor to release Mr. Jackson so that we can prepare him for the trial ahead.

Respectfully submitted,

*Susan G. Kellman*

Susan G. Kellman

cc:   All counsel

Sequan Jackson