Mal2JacC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          22 Cr. 352 (JSR)

5   SEQUAN JACKSON,

6              Defendant.

7   ------------------------------x       Conference

8                                         October 21, 2022
                                          3:50 p.m.
9

10  Before:

11                   HON. JED S. RAKOFF,

12                                        District Judge

13

14                        APPEARANCES

15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  BY:  RUSHMI BHASKARAN
         ADAM S. HOBSON
18       Assistant United States Attorneys

19
    SUSAN G. KELLMAN
20       Attorney for Defendant

21

22  Also Present:

23  Marlon Ovalles, Pretrial Services Officer, SDNY

24  Chris La Tronica, Esq.

25

Mal2JacC kjc

1          (Case called)

2          THE DEPUTY CLERK:  Will everyone please be seated and

3     will the parties please identify themselves for the record.

4          MS. BHASKARAN:  Good afternoon, your Honor.  Rushmi

5     Bhaskaran and Adam Hobson for the government.  We are joined at

6     counsel table by Marlon Ovalles of Pretrial Services.

7          THE COURT:  Good afternoon.

8          MS. KELLMAN:  Good afternoon, your Honor.  Susan

9     Kellman and, your Honor, I am assisted at counsel table by

10    Chris La Tronica.  Mr. La Tronica is a member of the Eastern

11    District -- I hate to say those words here, but the Eastern

12    District mentoring program, and we have been trading back and

13    forth since we all have a lot of trials.  I will write to your

14    Honor and explain a little bit more about that, but that is why

15    he is at counsel table.

16         THE COURT:  Okay.

17         MS. KELLMAN:  He is assisting me.

18         THE COURT:  Okay.  We are here for the request for

19    release on bail.  Before I hear from counsel, in the

20    submissions that I received from Ms. Kellman, there was one

21    thing that struck me as very contrary to what I had previously

22    been told, and that is that "much of the discovery has not yet

23    even been produced."  That's a quote from her letter.

24         Now, this case began some months ago.  At that time

25    the government indicated that it was promptly turning over the

Mal2JacC kjc

1    discovery.  At a subsequent conference, the government

2    represented that all discovery had been turned over.  In

3    addition, at the request of defense counsel, the Court had

4    appointed a discovery coordinator who also represented

5    explicitly to the Court that all discovery had been turned over

6    to defense counsel, along with her analyses of much of the

7    discovery that of course would ease the burden of any new

8    counsel getting into the case.

9              Now, this was all before you were appointed because

10   your client wanted new counsel and I granted that request.  But

11   given those representations, I don't understand.  Are you sure

12   you haven't received all discovery?

13             MS. KELLMAN:  No, I have not received any discovery,

14   Judge.  But just to fill in the Court, and I will start from

15   when I was assigned, I reached out to Mr. Cecutti or he reached

16   out to me and he told me that he hadn't yet received any

17   discovery.  So I reached out to -- any discovery.  So I reached

18   out to the coordinator, and she told me that she had just put

19   it in the overnight mail to all of the lawyers and that they

20   should be getting it over the weekend.  And so as soon as

21   Mr. Cecutti got it -- I believe she also sent me a copy, but by

22   Monday I had two copies of it, but I hadn't had any at the

23   time.

24             THE COURT:  Okay.  But you have had it.

25             MS. KELLMAN:  That's the first production.  I think it

Mal2JacC kjc

1    is the first three productions.  But since then, your Honor,

2    including, I think, up to yesterday, we have been getting

3    discovery on an ongoing basis, on a rolling basis and it is not

4    an insignificant amount of discovery.  It includes a tremendous

5    amount of phone data --

6         THE COURT:  Well, of course, you may recall that in

7    part -- this is before you were in the case, but if you examine

8    the record, before the current trial date was set for your

9    client and several others, the Court, based on, among other

10   things, the volume of discovery and also the schedule of

11   various counsel and so forth, had scheduled a trial for May 1,

12   and that date is still available to you and your client if you

13   want it.  But he didn't want it.  He said, no, I want a speedy

14   trial.  And I questioned him and the others who so requested

15   it.  I said:  You understand that although, in my view, from

16   what I understand of the case, counsel can be prepared to try

17   this case, they would be even more prepared if they had all the

18   way to May.  And he said, yes, he understood that, but he still

19   wanted the earlier trial date.  So some of this is, I think,

20   implicit in the choices he made.

21        However, let me ask the government.

22        MS. KELLMAN:  Your Honor, if I may add one thing?

23        THE COURT:  Yes.

24        MS. KELLMAN:  At the time, of course, he said that, I

25   believe they didn't have any discovery.  There was still no

Mal2JacC kjc

1    discovery had been produced.  But now, as I said, we have

2    gotten the first production.  But the first production is

3    really critical in a respect because when the coordinator, the

4    discovery coordinator turned it over, she had downloaded a

5    significant portion of it with a program that nobody I knew

6    could open.  And I had a young lawyer who works for me spend an

7    entire day downloading it.  It took all day to download, and

8    then it didn't work.  And so we have had a tremendous amount of

9    difficulty.  I didn't try it myself because I wouldn't have

10   been able to.

11            THE COURT:  Because lawyers are not technologically

12   adept.

13            MS. KELLMAN:  But the young ones are.  And then when

14   she couldn't do it, I turned it over to my daughter, who is a

15   video expert.  So she did open it eventually.  But we had to

16   use a different computer and a different program, and it took

17   almost three days to just open the material, forget going

18   through it.  Now, that isn't to say that my client can open it

19   at the jail.  In a million years he couldn't open it.

20            THE COURT:  So but I didn't understand you to be

21   making an application for an adjournment based on all --

22            MS. KELLMAN:  I'm not.

23            THE COURT:  You are not.

24            MS. KELLMAN:  My client still would like to go to

25   trial --

Mal2JacC kjc

1          THE COURT:  Very good.

2          MS. KELLMAN:  -- notwithstanding our ability to go

3    through all of the discovery.

4          THE COURT:  The other logistical problem -- I do want

5    to hear from the government about discovery in a minute, but

6    the other logistic problem you mentioned was problems getting

7    access to him.  So this is a frequent problem.  My policy,

8    which, again, because you were new you probably didn't hear me

9    say this, but I have said it in virtually every case where a

10   trial is looming, if you can't get adequate access to your

11   client, you and the government then need to call me and I will

12   call the warden.  And last I checked, the warden has some say

13   in these things.

14         MS. KELLMAN:  Some say.

15         THE COURT:  No, indeed, every time I have made this

16   request to a warden, that has solved the problem.  Because the

17   warden understands that the case has to be given priority

18   because of the looming trial.

19         So I am happy to do that if you continue to have

20   problems at the MDC.

21         MS. KELLMAN:  I think that would be -- I'm assuming

22   that we still have the option of bail, but assuming that we

23   don't --

24         THE COURT:  Of course if I grant bail, this is all

25   moot.

Mal2JacC kjc

1          MS. KELLMAN:  This is academic, of course.  But on the

2     off chance that we need it, I will say that we have had quite a

3     bit of difficulty just getting -- there is a new rule at the

4     MDC that says now you can bring in a laptop.  You just have to

5     fill out a form and you go in and you take the laptop, which is

6     great, because my client can't open the discovery himself.

7     Then we can bring it in and we can show it to him on the

8     laptop, except for one thing, they don't let you in when you

9     have it.  You have to fill out the form, and now it has to be

10    approved.  Well, it is already approved.  It is preapproved.

11    We have gone through this every single --

12          THE COURT:  I don't want to take all day on --

13          MS. KELLMAN:  I hear you.

14          THE COURT:  -- this side issue.  My very simple-minded

15    approach is to call the warden and say, Make it work, and it

16    always succeeds.

17          MS. KELLMAN:  There you go.  Thank you.

18          THE COURT:  Now, what's the story on discovery?

19          MS. BHASKARAN:  Your Honor, we stand by all of our

20    prior representations about the production of discovery.  It

21    was substantially produced to the discovery coordinator by the

22    deadline set by the Court.  I believe it was August 16 or

23    thereabouts.  It then took the discovery coordinator several

24    weeks to get that discovery to defense counsel.  But as your

25    Honor noted, discovery counsel got the discovery to defense

Mal2JacC kjc

1    counsel.

2            We continue to make productions as we receive

3    material.  It is in our possession, and we push it out as soon

4    as we can.  The materials that we are pushing out now are

5    electronic devices that were seized at the time of the takedown

6    in this matter.  It takes time to be able to actually get into

7    those devices.  Sometimes they are password protected.  That

8    takes time.  Once we extract them, we are just pushing these

9    out to defense counsel without even reviewing them ourselves,

10   quite frankly.  We are just getting the data out as soon as

11   possible.  We are then following up with sets of identified

12   data from those devices so defense counsel knows the material

13   that we think is actually responsive to our search warrants.

14           THE COURT:  Why are you only getting this material

15   now?

16           MS. BHASKARAN:  It is a matter -- these devices are in

17   the hands of technicians who --

18           THE COURT:  Yes, and you knew that from day one.  So

19   my question is, what steps have you taken to say to the

20   technicians:  This is not just another matter.  This is a

21   matter in which it is critical that discovery be produced as

22   promptly as possible, and you have a choice, you can either put

23   more hands on it and get it quicker, or you can come in to

24   Judge Rakoff's courtroom and find out whether you should be

25   held in contempt?

Mal2JacC kjc

1          MS. BHASKARAN:  Your Honor, some of these devices are

2      in fact password protected, so it's a matter of hooking them up

3      to a machine and the machine trying to crack them open.  But we

4      have communicated to our agents the urgency of the production

5      of these materials, to be able to extract them and turn them

6      over.

7          THE COURT:  What's your worst-case scenario as to when

8      you can totally, completely finish discovery?

9          (Counsel confer)

10         MS. BHASKARAN:  Your Honor, there are still certain

11     devices that we have yet to get into because they are password

12     protected and the machine has not cracked into them yet.  So

13     perhaps we will never get into those devices and we will not

14     use them.

15         THE COURT:  Well, all right.  Here is what I think

16     makes sense.  Any discovery that you intend to use in any

17     respect must be produced by a week from today no matter what.

18     Anything produced thereafter cannot be used by the government.

19     Understood?

20         MS. BHASKARAN:  Understood, your Honor.

21         THE COURT:  Very good.

22         All right.  Now let's talk about bail.  So

23     Ms. Kellman, we are back to you.

24         MS. KELLMAN:  You may have taken away a lot of my

25     motivation, but I will persevere.

Mal2JacC kjc

1        The reality is, Judge, that preparing with our client

2   has been very, very difficult.  He has difficulty -- even

3   assuming that the warden makes every accommodation and we can

4   get in and we can see him as often as we would like, he can't

5   review the discovery separately and we can't sit in the jail

6   all day and all night reviewing the discovery.

7        THE COURT:  Yeah, but he knew all that when he made

8   the choice.  This is *déjà vu* as far as I'm concerned.  It was

9   his choice, which I totally understand, that he, rather than

10  sit in jail for many more months, would rather go forward.  He

11  even, in his initial application, said that he was directing

12  his counsel to withdraw any motions and not to file any

13  pretrial motions.  And I explained to him and to all the people

14  who are going forward that that could -- those motions could be

15  very helpful to the defense, they could narrow the evidence,

16  they could narrow the charges.  One of the defendants said,

17  well, he had heard through the other people at the MDC that

18  those motions rarely succeed.  I told him that was not true in

19  my court.  I also explained to him that I thought he might want

20  to reconsider relying for legal advice on people whose legal

21  advice is so good that they are sitting there in jail.  And so

22  but he -- all of this was explained, and so I will -- why don't

23  you do this.  If you can reach the warden today after we

24  conclude this proceeding—and that may not be possible because

25  it is late—but you and the government should try jointly to

Mal2JacC kjc

1    reach him, and if you do reach him, explain that this is -- and

2    I don't call him about every case, but I call him about cases

3    like this, that we want to make arrangements to get much

4    greater access to your client.  This is assuming I deny your

5    motion.  If I grant your motion --

6         MS. KELLMAN:  Which I can't imagine, but just in the

7    off chance, yes, Judge.

8         THE COURT:  If that doesn't have any effect or if he

9    doesn't say, well, you know, okay, or something like that, then

10   call me first thing Monday morning and I will call him before

11   noon Monday.

12        MS. KELLMAN:  Thank you, Judge.

13        THE COURT:  All right.  And that should be a joint

14   call with the government.

15        MS. KELLMAN:  Of course.

16        THE COURT:  Okay.

17        MS. KELLMAN:  The bail application.

18        THE COURT:  Back to -- yes.

19        MS. KELLMAN:  I would start with the fact that, as I

20   am sure your Honor knows, Pretrial Services did recommend that

21   Mr. Jackson be released on bond --

22        THE COURT:  Yes, I saw that.

23        MS. KELLMAN:  -- and believed that there was a

24   condition or a set of conditions that would guarantee -- that

25   would both protect the community and also guarantee his

Mal2JacC kjc

1      appearance in court.

2              The Pretrial Service agency recommended three

3      financially responsible cosigners.  We have offered six to your

4      Honor.  They are all people who have immediate connections to

5      this defendant——his mother, his father, his girlfriend, a

6      friend of his who's been a dear friend since they were children

7      in elementary school.  All of them work.  All of them have good

8      jobs.  I have listed their employment for your Honor, but they

9      are mental health workers, and a --

10             THE COURT:  Yes, and I am sure that satisfactory

11     people could be found.  This, of course, would have to be

12     subject to being checked out by the government, but I am

13     assuming, and as I read your letter, you are also, although

14     it's not your first preference, you are also willing to have

15     home confinement and electronic monitoring if that is the route

16     the Court wishes to go.

17             MS. KELLMAN:  Correct, your Honor.  And I would also

18     say that we have -- we are certainly prepared to limit his

19     ability to travel, although he does also have a job offer --

20             THE COURT:  That's why I say it is not your first

21     preference.

22             MS. KELLMAN:  Because if he could work, that would

23     obviously be helpful to his family.  But it seems to me that of

24     course we will have easier access to him and he will be able --

25     for us, in this short amount of time, to prepare appropriately

Mal2JacC kjc

1   for the case and Pretrial, which is tasked with making a

2   determination as to whether or not they think he can be secure

3   and protect the community at the same time, that we would ask

4   your Honor to consider that, as I know you will.

5          But also my client had a number of -- wait.  Two

6   things.  One, with respect to the bail itself, I have before I

7   put this application together, your Honor, asked every one of

8   the potential cosigners for their -- a copy of their work

9   identification so I could confirm that they were in fact

10  working, a copy of tax returns they filed last year or their

11  W-2s, and their bank statement, so I have gotten all the --

12         THE COURT:  What about -- as I say, I'm confident that

13  you can satisfy that particular prong, but what about danger to

14  the community?

15         MS. KELLMAN:  Well, if he is locked at home, Judge --

16         THE COURT:  Well --

17         MS. KELLMAN:  -- and it seems to me that we would cut

18  down the same amount of difficulty as if we are talking

19  about -- I assume the only thing we are talking about is using

20  the phone, because he won't be able to leave the house and he

21  will have GPS monitoring, so your Honor and Pretrial will know

22  where he is at all times.  But if we were able to secure his

23  person in the house, then I would suggest he has probably the

24  same access to the telephone that he has at the MDC, so I don't

25  see how being in or out further that level of protection.  He

Mal2JacC kjc

1    can make --

2              THE COURT:  All right.  Let me take the liberty of

3    interrupting and hear from the government.

4              MS. BHASKARAN:  Thank you, your Honor.

5              We believe that continued detention is appropriate

6    here because of the danger to the community that this defendant

7    presents.  He is the second defendant on the indictment.  That

8    was a meaningful choice.  He was Jatiek Smith's lieutenant, and

9    he was one of the leaders of this very violent conspiracy that

10   extorted the fire mitigation industry.  He not just knew about

11   the violence that the First Response enterprise was

12   perpetrating on this industry, he directed it, and at least on

13   one instance he participated in that violence.  And so he is

14   instrumental to this enterprise being able to take over the

15   industry through violence and through extortion.  He in fact we

16   believe brought in Jatiek Smith into the industry after Smith

17   left jail.  Mr. Jackson was working in the industry before

18   then.  And he became Jatiek Smith's trusted lieutenant.  They,

19   we understand --

20             THE COURT:  The question is not -- what you are saying

21   is highly relevant, but the question is why, if he were subject

22   to home confinement and electronic monitoring, he would still

23   present a danger to the community in the four weeks or so,

24   well, five weeks or so before trial.

25             MS. BHASKARAN:  This is a defendant that the evidence

Mal2JacC kjc

```
 1   will show can do quite a lot of damage and danger just with his
 2   phone.  As the Court is probably aware, for just a two-month
 3   period in our investigation we had a wire on two phones.  One
 4   of those phones was Mr. Jackson's phone.  And while we were up
 5   on a wire, Jackson called one of his subordinates and told that
 6   subordinate to go make a show of authority against an industry
 7   participant that was not abiding by the First Response rules.
 8   What happened to that participant was that he was later
 9   assaulted by several individuals.  Those individuals, we
10   believe, were associated with First Response.  After being
11   assaulted, they took the victim's identification card and took
12   a photograph of it, which was an obvious effort to intimidate
13   that witness from speaking to the police.  So, your Honor, yes,
14   even if he is stuck at home, we believe that he could do quite
15   a decent amount of damage just by using the phone.  He is a
16   member of the Bloods.  He had Blood literature in his home at
17   the time of his arrest.  He had two firearms in a lockbox
18   underneath his bed with his passport.  So we think that speaks
19   volumes to who he is.  He could do quite a lot of damage with
20   the phone, your Honor.
21          THE COURT:  Let me hear finally from defense counsel.
22          MS. KELLMAN:  Well, your Honor, just with respect to
23   the government's comments, of course I assume——and I think
24   safely, though I don't like to assume——that those guns are no
25   longer in my client's home and his passport of course would be
```

Mal2JacC kjc

1    one of the conditions would have to be surrendered.  So --

2              THE COURT:  No.  The point, the general point that the

3    government is making is that your client has a history of

4    helping organize acts of violence or attempted violence or

5    threats of violence that have continued until quite recently

6    and that even by having access to the phone and the other small

7    amounts of opportunities presented, he could still exercise

8    that in a way, for example, that might serve to intimidate

9    witnesses.

10             So that is the gist of what they are arguing.

11             MS. KELLMAN:  And my argument, Judge, again, is he has

12   access to the telephone if he wants it at the jail, as well.

13   And sadly, but truthfully, for $50, anybody can use any cell

14   phone that they want.  The guards make them available on a

15   minute-by-minute basis.  I have clients asking me if they can

16   have $50 so they can text their relatives.  I said I can't

17   really be a part of that, thank you very much.  But if he

18   wanted to be doing that from the jail, he wouldn't have any

19   difficulty doing that from the jail.

20             And also to the point of the subordinate, he may have

21   well spoken to a subordinate.  I wasn't there.  I haven't heard

22   a recording of that conversation.  But what the subordinate did

23   with his own judgment and the decision that the subordinate

24   made, we don't know if Mr. Jackson told him to be violent or to

25   threaten violence or if this was done on the subordinate's own

Mal2JacC kjc

1    and maybe that subordinate was disciplined for taking action

2    that Mr. Jackson thought was inappropriate.  I don't know the

3    details of that yet, and I will certainly learn them.  But I

4    think that to assume always that violence comes back to him, he

5    had worked in the industry for quite a while before the charged

6    period of the indictment, which starts actually many years

7    after he's been in the industry without complaint --

8                THE COURT:  Let me ask you this:  Supposing the

9    conditions of bail were home confinement 24/7 and no release

10   except to meet with his attorneys, and that the -- either no

11   telephone or calls that would be restricted solely to his

12   attorney, which could then be themselves monitored, is that

13   acceptable to you?

14               MS. KELLMAN:  Is that at my direction --

15               THE COURT:  Yes.

16               MS. KELLMAN:  -- or the government's, your Honor?

17               Yes, I think that would be acceptable.

18               THE COURT:  So let me go to the government.  So if

19   there is home confinement, electronic monitoring, he is not out

20   at all for a job or anything else -- by the way, where is he

21   going to be living?

22               MS. KELLMAN:  Let me just make sure.

23               (Defense counsel and defendant confer)

24               MS. KELLMAN:  Your Honor, my understanding is he would

25   be living with his girlfriend on Metropolitan Avenue and they

Mal2JacC kjc

1    have a son together as well, a two-year-old son, and he would

2    be living there.

3         THE COURT:  Okay.  I want to ask the Pretrial Services

4    person if this can be arranged, but some arrangement where both

5    any existing telephone at that residence -- well, period, that

6    he can only use the existing telephone and that that would be

7    monitored with the consent of the girlfriend, so that it could

8    be detected who the calls were made to, and it would be limited

9    to calls to his attorney and no one else.  Why wouldn't that be

10   sufficient protection against danger to the community?

11        MS. BHASKARAN:  So, your Honor, for one thing, every

12   phone -- if the girlfriend has a phone, Mr. Jackson could have

13   access to that.  There could be other phones in the home that

14   we don't know about that we can't find that are being used.

15   Communication could be made not just from a landline, but more

16   likely on the Internet, so Internet usage would need to be

17   monitored.  There are just many opportunities for someone to

18   find a way to communicate with the outside world, and everyone

19   in the household would -- in order for this to work and to be

20   enforceable, I would imagine that everyone in the household

21   would have to be subject to this communication-less type of

22   existence.

23        THE COURT:  So you are right that it would have to

24   be -- I gather there is only one other adult in the place and a

25   two-year-old child.  I think we can risk it with a two-year-old

Mal2JacC kjc

1  child.  So, yes, you would have to have the consent of the

2  girlfriend, which might include——which she may not be willing

3  to do——putting all of her electronic equipment subject to daily

4  monitoring by the Pretrial Services.

5       Let me ask Pretrial Services, maybe I am talking about

6  something that's not really feasible.

7       THE PROBATION OFFICER:  I was thinking to myself --

8  good afternoon, your Honor, by the way.

9       My understanding of Pretrial Services, when it

10  conducts monitoring of electronic devices, it is usually

11  limited for those defendants that are being charged in sex

12  offense cases, such as child pornography, where we do install a

13  program that lets us know what websites are being visited, what

14  images are being viewed.

15       I think what's being discussed here is something

16  similar to a wire being listened in to or checking the

17  defendant's phone for text messages and things of that nature.

18  To my understanding, your Honor, Pretrial does not have the

19  capability of conducting the monitoring that is being discussed

20  this afternoon.  However, I can confirm that, but that's my

21  understanding that we do not do that, your Honor.

22       THE COURT:  All right.  So here is where I think I

23  come out.

24       I think the main danger here is danger to the

25  community, and there is, I'm sorry to say——this has nothing to

Mal2JacC kjc

1    do with the defendant *per se*——there is a long history in this

2    court of persons in similar groups, like the Bloods, of not

3    only violence, but witness intimidation, and that is a very

4    great concern to the Court with a trial coming up so soon.

5          Nevertheless, if a methodology could be worked out

6    where in fact it would be the functional equivalent of his

7    being in a cell, where, for example, the phone calls are

8    recorded, but it would be in his home or his girlfriend's home,

9    where he could have much more complete access to his counsel, I

10   think that would be arguably acceptable to the Court.  And the

11   reason I am phrasing it that way, and I am sorry it is a Friday

12   afternoon, but I think what counsel jointly needs to do have a

13   discussion on Monday with Pretrial Services and explain to them

14   that the Court is at least arguably amenable to a release so

15   that there can be greater contact with counsel and greater

16   preparation for trial, provided that there are enough

17   safeguards to genuinely prevent against even the possibility of

18   witness intimidation or other violence, and then we will

19   reconvene.

20          And I'm sorry, because I see a lot of fine people came

21   down here today, but I think it is to everyone's benefit that I

22   not make this ruling until I know exactly what is or is not

23   possible.  So we will reconvene -- and after you have had that

24   discussion with Pretrial Services, jointly call my chambers and

25   we will figure out -- I have a trial starting Monday, but we

Mal2JacC kjc

1   will find a way to squeeze things in.  All right?

2            So the motion technically is denied for now but very

3   much open to --

4            MS. KELLMAN:  Or held in abeyance.

5            THE COURT:  Or held in abeyance.  That's even better.

6   I like that.  Very good.  Thanks.

7            MS. KELLMAN:  Thank you, your Honor.

8                                oOo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25