UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

          -against-

Sequan Jackson

                     Defendant

22 Cr. 352 (JSR)

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANT SEQUAN JACKSON'S MOTION TO SUPPRESS

---

Susan G. Kellman, Esq.
Ezra Spilke, Of Counsel
Chris La Tronica, Of Counsel
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
sgk@kellmanesq.com
ezra@spilkelaw.com
cmlatronica.law@gmail.com
Attorneys for Sequan Jackson

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ i

**TABLE OF AUTHORITIES** .......................................................................................... ii

**STATEMENT OF FACTS**............................................................................................ 1

   **I.    Information Purporting to Provide Probable Cause for Title III Interceptions** ......... 2

      a.    Witness Accounts Corroborated by Saved Audio & Video Recordings......................... 2

      b.    Text Message Conversations.................................................................................. 3

      c.    "WhatsApp" Encrypted Messaging Application Group Conversation ........................... 4

   **II.   Necessity of Wire Tap** ....................................................................................... 5

   **III.  Initial Wiretap—October 15 to November 12, 2021** ............................................. 9

   **IV.   Wiretap Extension—November 12 to December 12, 2021** .................................... 11

   **V.    WhatsApp Use by First Response** ...................................................................... 13

   **ARGUMENT** ............................................................................................................ 16

   **I.    Jackson Has Standing to Challenge the Admissibility of Evidence from the Smith
          Wiretaps.** .......................................................................................................... 17

   **II.   Suppression Is Warranted Because the Government Failed to Provide a "Full and
          Complete" Affidavit That Addressed Truthfully the Necessity of Wiretaps.** ............. 17

      a.    The Government Did Not Establish That Normal Investigative Procedures Failed, Were
            Unlikely to Succeed if Tried, or Were Too Dangerous. ........................................ 19

      b.    Assuming *Arguendo* That the Government Established the Necessity of Extraordinary
            Investigative Techniques, WhatsApp's End-To-End Encryption Rendered the Wiretap
            Ineffective. ........................................................................................................ 25

   **III.  Jackson Joins in Co-defendant's Motions.** ......................................................... 28

   **CONCLUSION** ......................................................................................................... 28

# TABLE OF AUTHORITIES

<u>Cases</u>

*Dalia v. United States*, 441 U.S. 238 (1979) ................................................................... 17

*Franks v. Delaware*, 438 U.S. 154 (1978) ....................................................................... 26, 27

*Johnson v. United States*, 333 U.S. 10 (1948) ................................................................. 26

*United States v Concepcion*, 579 F3d 214 (2d Cir 2009) ............................................... 24

*United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001) ............................................. 22

*United States v. Gigante,* 538 F.2d 502 (2d Cir. 1976) ................................................... 26

*United States v. Giordano*, 416 U.S. 505 (1974) ............................................................. 18, 26, 27

*United States v. Kahn*, 415 U.S. 143 (1974) ..................................................................... 18

*United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983) ........................................................... 17, 18, 21, 24

*United States v. Spagnuolo,* 549 F.2d 705 (9th Cir. 1977) .............................................. 26

<u>Statutes</u>

18 U.S.C. § 2515 ............................................................................................................... 24

18 U.S.C. § 2518 ............................................................................................................... passim

18 U.S.C. §2510 ................................................................................................................ 17

## STATEMENT OF FACTS

On October 14, 2021, Homeland Security Investigations (HSI) Special Agent William Clark swore an affidavit in support of an application for Title III interceptions of a cell phone used by Sequan Jackson (347-662-1334) and his co-defendant Jatiek Smith (929-320-8554). According to Agent Clark, in March 2021,[1] HSI, the Federal Bureau of Investigations (FBI), the New York City Police Department (NYPD), and New York City's Department of Investigation (DOI)—collectively the "Investigating Agencies"—started investigating First Response Cleaning Corp. ("First Response"), a fire mitigation company based in Brooklyn, New York. (Kellman Decl. Ex. A at USAO_000058).[2] When a property suffers fire damage, the insurance claim process involves various actors, including public adjusters—who assist property owners with insurance claims—and fire mitigation companies—which receive a portion of an insurance claim to clean up the aftermath of fire damage.

The investigation into First Response began after the Investigating Agencies received a report from the National Insurance Crime Bureau (NICB). (Ex. A at USAO_000058). According to Agent Clark, the NICB report—which has yet to be provided in discovery—alleged that an insurance company made a report that First Response hired members of "the Bloods." (Ex. A at USAO_000058).

Immediately upon starting this investigation, on March 2, 2021, Customs and Border Protection seized Smith's iPhone, as he re-entered the country from a trip to Jamaica, W.I., made a forensic copy, and returned the phone to Smith—who continued using that device. (Ex. A at

---

[1] Unless otherwise designated, all dates contained in the Title III materials disclosed by the government are approximate.

[2] All exhibits referenced herein are annexed to counsel's declaration submitted along with this memorandum of law.

USAO_000060-61). This extraction was complete on March 2, 2021 at 7:12 PM. (Kellman Decl. Ex. F at JACKSON_00001). On April 9, 2021 the Honorable Stewart D. Aaron, United States Magistrate Judge, signed a warrant authorizing the search of the forensic copy of Smith's iPhone. (Ex. A at USAO_000061).

Agent Clark's application for Title III interceptions relied heavily on the information contained in the forensic copy of Smith's phone. According to the affidavit, witness accounts were corroborated by (1) saved audio and video recordings; (2) text message conversations; and (3) a group conversation contained in the "WhatsApp" encrypted messaging application that purportedly discussed acts of extortion by members of First Response. (Ex. A at USAO_000060-76).

## I.   Information Purporting to Provide Probable Cause for Title III Interceptions

### a.   Witness Accounts Corroborated by Saved Audio & Video Recordings

The audio recordings saved to Smith's iPhone consisted of "conversations in which he discussed the extortion scheme and certain Target Subjects' role in the scheme." (Ex. A at USAO_000061). Also saved on Smith's iPhone were video recordings depicting alleged assaults conducted by employees of First Response. (Ex. A at USAO_000061).

Agent Clark concluded that these saved audio and video recordings were evidence of rules that Smith imposed on the fire mitigation industry. (Ex. A at USAO_000064). Witness interviews conducted as part of the investigation corroborated that these audio and video recordings were related to an alleged "rotation system" that Smith imposed upon public adjusters. Allegedly, this rotation required the "the first ten fires of every month. . . go to First Response." (Ex. A at USAO_000064). "After the first ten fires, public adjusters are supposed to rotate between a number of other companies, and they are directed to call JATIEK SMITH or, in

the alternative, to call SEQUAN JACKSON, to find out which EMS company is next in the rotation." (Ex. A at USAO_000064).

By October 14, 2021, the date of the application for the Title III interceptions, the Investigating Agencies interviewed approximately fifteen individuals who were alleged to be victims and/or witnesses. (Ex. A at USAO_000065). Agent Clark highlighted information from four of those individuals in the affidavit in support of the application for a Title III intercept. (Ex. A at USAO_000065-66). These individuals are all public adjusters operating in the New York City metropolitan area. (Ex. A at USAO_000066-69). At least two of these individuals informed law enforcement that they engaged in calls with both the Smith and Jackson phones that were the subject of the application for the Title III intercept. (Ex. A at USAO_000071).

Agent Clark provided no further details regarding the eleven other individuals the investigating agency interviewed prior to applying for the Title III interceptions. Rather, Agent Clark summarily concluded that "[b]ased on my training and experience. . .witnesses who fear retaliation from perpetrators are often reluctant to speak with law enforcement. Accordingly, law enforcement officers do not expect that these victims will record conversations with the Target Subjects or undertake other proactive steps at this time." (Ex. A at USAO_000071). To support this conclusion, Agent Clark referenced an attempt in August 2021 where "law enforcement officers requested that Victim-3 make recordings of conversations with the Target Subjects and Victim-3 refused the request." (Ex. A at USAO_000071). Agent Clark's affidavit contained no explanation offered by Victim-3 for the refusal or other efforts made by the Investigating Agencies to record conversations.

### b.  Text Message Conversations

The text messages referenced in Agent Clark's application are all between Smith and other alleged co-conspirators. (Ex. A at USAO_000073-71). The majority of the text exchanges

refer to conduct unrelated to the target offenses. For example, Smith is purported to have requested fictitious pay stubs for his son's mother to get an apartment or an advance on his salary from the owner of First Response. (Ex. A at USAO_000073-71).

As to evidence of the target offenses, Agent Clark references a text message suggesting the actual use of violence by Smith – "Change of plans...gotta go slap someone." (Ex. A at USAO_000072). Agent Clark concludes that "[b]ased on [his] training, experience, and review [sic] this and other similar messages. . . that SMITH was informing [an owner of First Response] that his availability had changed suddenly because of a need to go use force against a public adjuster who was not following SMITH'S instructions." (Ex. A at USAO_000072). Agent Clark did not cite other messages supporting this conclusion.

### c.   "WhatsApp" Encrypted Messaging Application Group Conversation

The Title III application makes two brief references to "WhatsApp" group conversations found on Smith's phone. (Ex. A at USAO_000076-78). Agent Clark concludes that these two conversations are examples of Smith directing co-conspirators to engage in acts of violence to intimidate public adjusters and other competitors in the mitigation industry. (Ex. A at USAO_000078). The forensic copy of Smith's iPhone contains 57,901 messages. (Ex. F at JACKSON_00002). WhatsApp conversations account for 79% of these messages. These 40,163 messages occur in sixty-two separate WhatsApp conversations. The examples cited in Agent Clark's affidavit come from one conversation with twenty-five participants—far in excess of the seven listed target subjects for the application. (Ex. A at USAO_000050). Additionally, Agent Clark's affidavit makes no mention of other large group WhatsApp conversations. For example, the affidavit omits a conversation consisting of over 1,000 pages and containing thirty-two participants, some of which have WhatsApp usernames indicating an association with other fire mitigation companies. (Ex. F at JACKSON_00002, JACKSON_ 10913-11920). Specifically,

- 4 -

these conversations include participants that self-identified with the following mitigation

companies: iFlood; Emergency Fire Service; and ServePro. In this conversation, these thirty-two

participants discuss signing up fire mitigation jobs and who is "up next" to receive a job. (Ex. F

at JACKSON_ 10913-11920).


## II.    Necessity of Wire Tap

As to the necessity of wiretap interceptions, the affidavit contained the boilerplate

language that "normal investigative procedures have been tried and have failed or reasonably

appear to be unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the

Interception herein sought." (Ex. A at USAO_000086). Agent Clark swore that the use of

undercover officers would place them in danger without "any significant investigatory

advantage." (Ex. A at USAO_000087). Per Agent Clark's affidavit, "[o]n or about February 4,

2021, law enforcement officers sent an NYPD undercover officer to a fire-damaged property in

Staten Island, New York in an effort to obtain evidence of extortion." (Ex. A at USAO_000086).

It is unclear why this undercover effort was attempted a month prior to the Investigative

Agencies commencing the investigation into First Response.[3] Regardless, Agent Clark concludes

that this undercover operation was "ultimately unsuccessful because JATIEK SMITH did not

show up at the property and the undercover officer was unable to initiate communications." (Ex.

A at USAO_000086).

---

[3] Much of the affidavit was boilerplate, and it could be that the date in Agent Clark's affidavit is
simply a typographical error leftover from an early template for a similar application in another
case. The undersigned notes that much of the quoted language from Agent Clark's justification
for the necessity of a wiretap in the affidavit is identical to prior applications reviewed in
unrelated cases.

Additionally, Agent Clark concluded that the use of undercover agents would not work because "[s]ome of the co-conspirators share a gang affiliation and, accordingly, are wary of outsiders and unlikely to discuss the extortion scheme with outsiders." (Ex. A at USAO_000086). Moreover, even if an undercover agent were "to gain employment at First Response. . . they would not have any plausible reason to inquire about tactics used to intimidate co-conspirators, and inquiries on these subjects would, at the very least, likely arouse suspicion of the agent." (Ex. A at USAO_000086). These conclusions were called into doubt on November 11, 2021 at approximately 2:50 PM when Smith initiated an interview with the NYPD. The purpose of this interview was to discuss First Response's operations. Smith did this after learning that the NYPD spoke to the owner of another fire mitigation company about First Response. (Kellman Decl. at 1 ¶6)

The application also concluded that the use of confidential sources (CS) would not achieve the investigation's objectives. The Investigative Agencies attempted to develop a CS, however these efforts were ultimately not successful because this single individual was "not situated to provide an insider's view of the extortion scheme or the racketeering enterprise." (Ex. A at USAO_000088). Other than this single individual, Agent Clark was "aware of no other confidential source, or likely confidential source, who has information that could accomplish the investigation's objectives, or the ability to significantly assist the investigation." In his analysis Agent Clark does not discuss the multiple WhatsApp group conversations discussing First Response's daily operations and the rotation of mitigation jobs between various mitigation companies all of which was contained on the forensic copy of Smith's phone.

Agent Clark then swore that physical surveillance would not bear fruit because "many of the violent acts occur at the sites of fires or at other random locations. Fires can occur at any time

- 6 -

and in any place." (Ex. A at USAO_000088). Moreover, "[w]hile law enforcement officers can attempt to conduct surveillance at the scene of a fire, the Target Subjects are often outside the residences after fires raising the possibility that they will detect the present [sic] of law enforcement officers conducting surveillance." (Ex. A at USAO_000088). Agent Clark's analysis of this issue does not acknowledge that several of the large WhatsApp conversations on Smith's phone exist for the purpose of responding to fires. Moreover, it does not address the reality that law enforcement officers, typically wearing body-cams, are commonly present at fires occurring in the New York City area to establish physical barriers and assist fire personnel responding to fires. Thus, there would be nothing inherently suspicious about a uniformed member of NYPD being present at the scene of a fire – and a body-cam would have provided first hand documentation of the information that Investigative Agencies sought to discover.

Next, Agent Clark contended that pole cameras and geolocation information would be ineffective. (Ex. A at USAO_000090-91). Additionally, telephone records and pen registers are inadequate without "the combination of wire surveillance, visual surveillance, and other investigatory tools." (Ex. A at USAO_000091-92). While search warrants executed so far "confirmed the existence of the extortion scheme and provided information about the particulars," they were equally inadequate because "the search warrants to date have provided a glimpse into the extortion scheme but not a comprehensive picture of its scope." (Ex. A at USAO_000092-93).

In contrast to these ineffective investigatory techniques, the fifteen witness interviews conducted prior to the time of the filing of the application "provided a picture of historical acts of violence and methods of intimidation that are being used by the Target Subjects." (Ex. A at USAO_000093). Additionally, recent interviews disclosed that "SMITH is increasingly directing

his victims to call JACKSON to learn which company is the next in the rotation system. . .
Accordingly, JACKSON is expected to have increasing interactions with victim public adjusters
who are complying with the rules set for the industry." (Ex. A at USAO_000094). Despite the
insight witness interviews provided into the recent changes in the internal operations of First
Response, Agent Clark concludes that interviews will also be ineffective because "the victims
have limited insight into the internal operations of the racketeering scheme and cannot explain
the enterprise." (Ex. A at USAO_000094).

Once the wiretap was authorized, the investigating Agencies all but stopped interviewing
witnesses. In his November 12, 2021 affidavit to extend the wiretap, Agent Clark states that
"Law enforcement officers. . . have [now] conducted interviews of approximately 16 victims."
(Ex. A at USAO_000170). Previously, the October 14 affidavit indicated the Investigative
Agencies interviewed fifteen witnesses. (Ex. A at USAO_000065). Therefore, while the wiretap
was active the Investigating Agencies were only able to interview one additional witness.
However, since the November 12 affidavit requesting an extension, the government inexplicably
was able to interview additional witnesses for a total of over forty-four witness interviews.
(Kellman Decl. at 1 ¶4). Finally, Agent Clark concluded that grand jury subpoenas, cooperating
witnesses, and arrests provide either limited insight into the target offenses or alert the subjects to
the existence of the investigation, thus frustrating efforts to apprehend all of the participants in
the trafficking conspiracy. (Ex. A at USAO_000095-97).[4]

---

[4] Stepping back for a moment, it seems as though Agent Clark's affidavit was more of a list of
excuses than a substantive analysis of all of the potential avenues he'd identified and chose to
disregard. Indeed, if the forensic copy of Smith's iPhone, which contained 57,901 messages
between the alleged co-conspirators (Ex. F at JACKSON_00002; JACKSON_00003- 11920),
perhaps there was nothing that entitled the Investigative Agencies to continue its search.

### III.     Initial Wiretap—October 15 to November 12, 2021

Upon the government's application, which incorporated Agent Clark's affidavit, the Honorable Lewis J. Liman, authorized the wiretap interception on October 14, 2021. (Ex. A at USAO_0000102); and the interception began on October 15, 2021. (Kellman Decl. Ex. B at USAO_000275) Between that date and November 12, 2021, Agent Clark identified intercepted communications related to eleven distinct events believed to be in furtherance of the target offenses that are the target of the investigation. (Ex. B at USAO_000138-161). These events are:

1. An October 18, 2021 alleged assault by a member of First Response against a roofing contractor in response to a failure to properly cover a roof resulting in damage to sheetrock. (Ex. B at USAO_000138-142).

2. An October 19, 2021 call between Smith and a person known as Carlos Flores in which the latter "appears to be asking SMITH to help him get business," which Agent Clark concludes "show[s] SMITH's control over the industry and SMITH's enforcement of a rotation system." (Ex. B at USAO_000142).

3. An October 20, 2021 call with Jackson and Anthony McGee (another target of the investigation) in which McGee asks Jackson "Who's up next?" to which Jackson responds "give it to ServPro," and then "double up on the other companies."

4. An October 26, 2021 call between Smith, Octavio Peralta (a public adjuster who is suspected of conspiring with SMITH) and an individual known as "Cliff" in which Agent Clark concludes "the participants are agreeing to try to hide from the insurance company the fact that a property has an unlawful occupant and is therefore not a covered loss." (Ex. B at USAO_000147).

5. An October 28, 2021 call with Smith and Christopher Persky (a public adjustor) over a dispute involving a $25 million fire loss in Queens which Agent Clark concludes SMITH

threatens Persky with violence if Persky does not attempt to get invoices Smith submitted on the job paid. (Ex. B at USAO_000152).

6. An October 28, 2021 call with Smith, Jackson, and Jordan Boryk (another target of the investigation) in which Agent Clark concludes Boryk discusses tactics Smith and Jackson "used to control the EMS industry." (Ex. B at USAO_000154).

7. An October 28, 2021 text by Jackson stating, "This is Sequan the manager for first response." (Ex. B at USAO_000158).

8. A November 1, 2021 call with Jackson and a person identified as Giovanni Villon in which "Villon asks JACKSON which public adjuster is next in the rotation, and JACKSON tells him anyone but 'Octavio,'" and "Villon also talks about the fact that there is an illegal kitchen in the basement of the property, so they will need a specific public adjuster to handle the job." (Ex. B at USAO_000158).

9. A November 5, 2021 call with Jackson and a purported "owner of a property that suffered fire damage" in which "JACKSON says to Robert, 'you had a fire, had some tenants, whatever the case is, let's leave things off the record." (Ex. B at USAO_000158).

10. A November 7, 2021 call with Smith, Jackson, and Boryk "discussing the impact SMITH has had on the fire insurance industry and the control he exerts over the industry." (Ex. B at USAO_000154).

11. A November 25, 2021 text between Smith and Peralta, in which Peralta stated, "Signed Ron this afternoon." Agent Clark, relying on his "training and experience and participation in this investigation" determined "this to be a communication between SMITH and Peralta about a new customer that Peralta has signed" but ultimately concluded that "[though he did] not at this point know the full extent, the signing of

'Ron' as a client maybe part of the illegal extortion scheme to provide First Response with clients." (Ex. B at USAO_000154).

These discussions formed part of the basis for necessity in Agent Clark's November 12, 2021, affidavit in support of an extension of the wiretap. (Ex. B at USAO_000138-161). The interceptions received between October 15 and November 12 2021 did not, according to Agent Clark, fulfill the objectives of the investigation. (Ex. B at USAO_000161). Rather, "continued interceptions are necessary to understand the full scope of the racketeering and extortion conspiracy." (Ex. B at USAO_000161). The only additional support for an extended wiretap that Agent Clark cited in the November 12 affidavit were facts and assertions that were identical in all material respects to the October 14 affidavit. (*Compare* Ex. A at USAO_000046-102, *with* Ex. B at USAO_000123-179). On November 12, 2021, the Honorable Lewis J. Liman authorized extending the wiretap interception of the cell phones used by Smith and Jackson. (Ex. B at USAO_000179).

## IV.    Wiretap Extension—November 12 to December 12, 2021

The extended wiretap ran from November 12 until it was taken down on December 12 2021. (Kellman Decl. Ex. C at USAO_000300). During that time period, reports were filed detailing the following conversations believed to be evidence of historical or ongoing participation in the Target Offenses.

1. A November 16, 2021 call with Smith and a person identified as Bobby discussing an in-person meeting involving fourteen individuals in the fire mitigation industry. (Kellman Decl. Ex. D at USAO_000289-90).

2. A November 16, 2021 call with Smith and Benjamin Vargas (owners of a mitigation company named ServPro) in which Vargas tells Smith he needs work and Smith tells him

- 11 -

he is "up next." (Ex. D at USAO_000290).

3.   A November 17, 2021 call with Jackson and Damon Dore (a first response employee) in which Dore tells Jackson he signed a job for a fire mitigation company known as "DRS" and Jackson tells Dore to follow up with the homeowners if he wants to obtain his commission for signing a job. (Ex. D at USAO_000290).

4.   A November 21, 2021 call with Jackson and Manny Pereira (another target of the investigation).

> On the call, JACKSON and Pereira appear to talk about the rotation system and which companies will receive certain jobs. For example, JACKSON tells Pereira, "I got First Response for one sixteenth, DRS for two one third, EFS for the main on a hundred and fourth, expo is going to First Response..." In describing various jobs assignments and which fire mitigation companies were assigned to them, *JACKSON and Pereira refer to a "chat," which agents believe is a WhatsApp group among the fire mitigation companies that are part of the rotation system.*

(Kellman Decl. Ex. E at USAO_000296). (emphasis added). The Investigating Agencies first came into possession of these WhatsApp group chats in the forensic extraction of Smith's phone seized during the border search and seizure on March 2, 2021. Select conversations were included in Agent Clark's initial affidavit for the Title III application. As previously discussed, Agent Clark's initial affidavit makes no mention of the nearly sixty thousand WhatsApp group chats that these Investigative Agencies already had from Smith's border crossing.

5.   A November 24, 2021 call with Jackson and an individual named Elvin Mata in which "Mata asks, 'I just wanted to ask you real quick who's up. Who do I put on paper.' JACKSON responds. . . 'First Response is up.' JACKSON further states, 'I don't know as far as the P.A.'" (Ex. E at USAO_000296).

6.   A November 27, 2021 call with Smith and McGee "where SMITH tells McGee that

'Elvin's definitely been hustling, so let's get Elvin. Lets get Elvin in on one or two'" and McGee responds "Alrighty, no problem, I got you." (Ex. E at USAO_000290).

7. A November 27, 2021 call with Smith and Kaheen Small (a First Response Employee) during which "SMITH asks Small whether EFS, a fire mitigation company, is on a job. SMITH then tells Small that the next job has to go to EFS, and following that, to ServPro." (Ex. E at USAO_000296).

8.

## V.    WhatsApp Use by First Response

The following table illustrates that the WhatsApp Chat identified in the November 21, 2021 call with Jackson and Pereira was previously referenced 125 times in fifty-two separate transcribed conversations during the fifty-eight days the wire was up.

| Date | # of Conversations Mentioning WhatsApp Chat" | Date | # of Conversations Mentioning WhatsApp Chat |
|---|---|---|---|
| 10/15/2021 | 3 | 11/12/2021 | 1 |
| 10/16/2021 | 1 | 11/13/2021 | 1 |
| 10/19/2021 | 1 | 11/14/2021 | 2 |
| 10/25/2021 | 1 | 11/19/2021 | 1 |
| 10/27/2021 | 2 | 11/20/2021 | 5 |
| 10/29/2021 | 1 | 11/21/2021 | 1 |
| 10/31/2021 | 1 | 11/23/2021 | 3 |
| 11/1/2021 | 1 | 11/24/2021 | 2 |
| 11/3/2021 | 1 | 11/26/2021 | 2 |
| 11/6/2021 | 3 | 11/27/2021 | 3 |
| 11/7/2021 | 3 | 11/29/2021 | 2 |
| 11/8/2021 | 1 | 11/30/2021 | 2 |
| 11/9/2021 | 3 | 12/1/2021 | 2 |
| 11/10/2021 | 2 | 12/7/2021 | 2 |

(Ex. G at JACKSON_11921-12046). Exhibit G contains excerpts of the identified transcripts. As discussed previously, interception began on October 15, 2021. On that day, the "chat" was

referenced three distinct times. Over the next fifty-eight days the target subjects of the wiretap referenced the WhatsApp chat—specifically that it contained operational information related to fire mitigation and the alleged rotation system—on twenty-eight different days. These conversations demonstrate that the daily operations of First Response and the alleged rotation system were almost exclusively contained in the end-to-end encrypted group chat.

Agent Clark's October 14 Affidavit referenced the WhatsApp Chat twice. (Ex. A at USAO_000076-78). The first reference stated that "on or about September 12, 2020, JACKSON, using Jackson Phone-1, engaged in a group conversation - through the Whats App application - with multiple individuals," and provided an excerpt from the WhatsApp chat on that date from the forensic copy of Smith's iPhone. (Ex. A at USAO_000076-78). In that conversation, which concerned a fire occurring in Brooklyn where someone named "Benny" claims to have been "called in" to work that specific fire, Smith instructed the others to "[t]ell him he's subcontracting it to us." (Ex. A at USAO_000077).

The second reference in Agent Clark's October 14 Affidavit stated that "on or about August 19, 2020, SMITH. . . asked: 'What companies are there.'" (Ex. A at USAO_000077). In response "JACKSON. . . responded: "Efs. Dude that I punched in the face. Lol. Jorden fires AD an hired this nigga lol.'" Agent Clark concluded that "'Efs' refers to Emergency Fire Services, which is a competitor of First Response." (Ex. A at USAO_000077). In total, the existence of the nearly 60,000 WhatsApp group messages are mentioned only three times in the wiretap applications: these two references in the October 14 Affidavit for the wire and the November 21, 2021 call with Jackson and Pereira.

WhatsApp was a rich source of information virtually overlooked by the agents. The forensic copy of Smith's iPhone contained four large group chats. The first message in each chat

group generated a message that read "Messages to this group are now secured with end-to-end encryption. Tap for more info." Each chat had the following identifying information:

- A 16-person chat called "FR Crew" formed on "12/23/2020." The first message in the chat sent by a participant was from Smith, which read "This is for the cleaning crew." The last message in the chat is dated "3/2/2021." The content of the chat indicates that it was used to share information related to fire mitigation jobs. (Ex. F at JACKSON_ 00003-00385).

- A 28-person chat, unnamed and formed on "5/5/2015." The first message in the chat sent by Smith was on "11/14/2019," however messages prior to this date appear on the copy of Smith's iPhone. The last message in the chat is dated "3/2/2021." The content of the chat indicates that it was used to share information related to fire mitigation jobs. (Ex. F at JACKSON_00386-06229).

- A 25-person chat, unnamed and formed on "6/3/2020." Smith created this chat to be able to communicate with individuals using android devices. The last message in the chat is dated "3/2/2021." The content of the chat indicates that it was used to share information related to fire mitigation jobs. (Ex. F at JACKSON_ 06230-10912).

- A 32-person chat called "We All in🔥🚒" formed on "8/12/2020." The first message in the chat sent by a participant was from Smith, which read "I started this chat... IFlood is in it now." The next message requested "Everyone check in!!!!!!" In response all participants identified themselves. When they did, their message also indicated the phone number they were communicating from. The chat is then used to share information related to fire mitigation jobs. The last message in the chat is dated "2/27/2021." The

content of the chat indicates that it was used to share information related to fire

mitigation jobs. (Ex. F at JACKSON_10913-11920).

Since at least March 12, 2016, the Department of Justice has been aware that end-to-end

encryption offered by the WhatsApp messaging application "makes it impossible for the Justice

Department to read or eavesdrop, even with a judge's wiretap order."[5] In late 2014, WhatsApp

began adding sophisticated encoding, known as end-to-end encryption, to its systems. This

ensured that only the intended recipients would be able to read the messages. When a wiretap

attempts to "listen in" on a WhatsApp encrypted conversation it produces useless data that is

incomprehensible. However, if a WhatsApp user enables a "cloud back up" of their messages "a

search warrant to one of those cloud services may yield WhatsApp data including message

content (although a search warrant to WhatsApp won't return message content)."[6]


### ARGUMENT

Title III requires government agents who file a wiretap application to provide "a full and

complete statement of the facts and circumstances relied upon by the application" to establish

probable cause, 18 U.S.C. § 2518(1)(b), and a "full and complete statement as to whether or not

other investigative procedures have been tried and failed or why they reasonably appear to be

unlikely to succeed if tried or to be too dangerous," *Id*. § 2518(1)(c). These two elements,

---

[5] *See* Andrew Sondern, WhatsApp Encryption Said to Stymie Wiretap Order, N.Y. Times, Mar.
12, 2016, https://www.nytimes.com/2016/03/13/us/politics/whatsapp-encryption-said-to-stymie-
wiretap-order.html, (last accessed February 6, 2023).

[6] We Now Know What Information the FBI Can Obtain from Encrypted Messaging Apps,
https://www.justsecurity.org/79549/we-now-know-what-information-the-fbi-can-obtain-from-
encrypted-messaging-apps/, (last Accessed 6 February 2023).

commonly called the probable cause and necessity requirements, must be met for a communication to be lawfully intercepted. An "aggrieved person" may move to suppress a communication intercepted pursuant to Title III on the grounds, among others, that the communication was unlawfully intercepted. 18 U.S.C. §2518(10)(a)(i).

## I.     Jackson Has Standing to Challenge the Admissibility of Evidence from the Smith Wiretaps.

Section 2518(10)(a) of Title 18 of the United States Code confers standing on any "aggrieved person" to move to suppress evidence collected under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §2510 et seq. An aggrieved person is anyone "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510(11).

Here, interception began October 15, 2021. According to the government, between that date and December 12, 2021, Jackson was a participant in forty-two calls intercepted on Smith's phone. (Kellman Decl. at 1 ¶5). Accordingly, Jackson is an aggrieved person and has standing under Title III.

## II.    Suppression Is Warranted Because the Government Failed to Provide a "Full and Complete" Affidavit That Addressed Truthfully the Necessity of Wiretaps.

The "necessity" requirement is essential to Title III: "The plain effect of the detailed restrictions of §2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed." *Dalia v. United States*, 441 U.S. 238, 250 (1979); *see also United States v. Lilla*, 699 F.2d 99, 105 n.7 (2d Cir. 1983) ("Without question, it would be in some sense more efficient to wiretap whenever a telephone was used to

facilitate the commission of a crime. But the statutory requirement that other investigative procedures be exhausted before wiretapping reflects a congressional judgment that the cost of such efficiency in terms of privacy interests is too high."). If the government failed to demonstrate the necessity of the wiretap, "no part of the contents of [communications intercepted from that wiretap] and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court."18 U.S.C. § 2515.

This requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). "[A]n affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible." *Lilla*, 699 F.2d at 103. "Wiretap warrants have been invalidated. . . where the record indicated that other procedures might have been used successfully." *Id*. at 104. Accordingly, Courts invalidate wiretap authorizations were the "use of the wiretap was merely a useful additional tool." *Id*.

When more than one application is made, each must be evaluated independently of the others. *See Giordano*, 416 U.S. at 531-33. Thus, extensions of an order of interception may be made only if the application was made in accordance with subsections (1) and (3) of §2518, 18 U.S.C §2518(5), including a full and complete statement on necessity and a judicial finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. §2518(3)(c). Applications for an extension must also include "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. §2518(1)(f).

### a. The Government Did Not Establish That Normal Investigative Procedures Failed, Were Unlikely to Succeed if Tried, or Were Too Dangerous.

The October 14, 2021 affidavit failed to demonstrate that normal investigative methods, both used and unused, were not feasible. As to human sources, law enforcement had found multiple witnesses eager to talk to them. The situation in the fire remediation industry was unlike a drug trafficking organization or street gang, in which secrecy reigns. Indeed, there was no attempt at secrecy whatsoever, as evidenced by the nearly 60,000 WhatsApp messages. The lack of secrecy is also supported by the observation that the Government provided 3500 material for forty-four witnesses that were interviewed over the course of the investigation. This is despite the fact that in both the October 14 and November 12 affidavits Agent Clark concludes that witness interviews would be ineffective.

At the time of the October 14 Affidavit the Investigating Agencies had "conducted interviews of approximately 15 victims and witnesses." (Ex. A at USAO_000093 (emphasis added). according to Agent Clark's affidavit,

> these interviews have provided a picture of historical acts of violence and methods of intimidation that are being used by the Target Subjects, in furtherance of the Target Offenses. The Investigating Agencies have learned about particular assaults committed by the Target Subjects and have learned how they have gained control in the industry. . . the Investigating Agencies learned that SMITH is increasingly directing his victims to call JACKSON to learn which company is the next in the rotation system. JACKSON is assuming this role so that SMITH can evade law enforcement detection. Accordingly, JACKSON is expected to have increasing interactions with victim public adjusters who are complying with the rules set for the industry.

(Ex. A at USAO_000093-94). However, Agent Clark then concludes, without any support that "the victims have limited insight into the internal operations of the racketeering scheme and cannot explain the enterprise." (Ex. A at USAO_000093-94).

Despite the fact that witness interviews provided a wealth of information, once the wiretap was authorized, the Investigating Agencies all but stopped interviewing witnesses. In his November 12 affidavit to extend the wiretap, Agent Clark states that "Law enforcement officers. . . have [now] conducted interviews of approximately 16 victims." (Ex. B at USAO_000170). Agent Clark does not address why the Investigative Agencies stopped investigating witnesses despite having access to WhatsApp conversations on the forensic copy of Smith's iPhone with scores of participants —some of which self-identified as working with other fire mitigation companies. Moreover, somehow after the wiretap was taken down the Government produced witness interviews of over forty witnesses. This raises an inference that rather than being ineffective, the Investigating Agencies stopped interviewing witnesses to create the appearance of necessity. Then, once the wire proved fruitless because of WhatsApp's end-to-end encryption, the Government returned to conducting witness interviews because this technique was effective.

The Government's two-faced analysis of the effectiveness of witness interviews also manifest in Agent's Clark's assessment of other normal investigative techniques. Most troubling here is that once the wire was authorized, the Investigative Agencies abruptly dropped all other investigative strategies – many of which had previously proved exceedingly useful. For example, electronic surveillance other than wiretap interception, had proven effective. Telephone records and pen registers allowed agents to observe patterns in Smith and Jackson's incoming and outgoing communications. Yet the government disparaged those methods because "toll records, unlike the requested interceptions, cannot provide the content of communications, which is an essential tool in identifying a criminal organization's members, interdicting its activities, and developing evidence of those activities." (Ex. A at USAO_000091). This is true of practically

every investigation. However, here the Government's reliance on the inability to provide the contents of communications as a justification for a wiretap is especially misleading.

Critically, at the time of the October 14 Affidavit, Agent Clark was aware through both witness interviews and a review of the forensic copy of Smith's phone that First Response and the alleged rotation system operated using a series of end-to-end encrypted chats. Ironically the Department of Justice knew that an intercept could not provide the content of WhatsApp communications, since at least March 12, 2016. Agent Clark's application fails to proffer how wiretap interceptions would reveal the communications of these encrypted conversations – because, in fact, he knows that they will not be of any assistance in this regard – underscoring the inescapable conclusion that the wiretap was nothing more than a fishing expedition.

Turning to the use of confidential sources ("CS"), Agent Clark makes no reference to any attempt to recruit a CS from the literal scores of names that were part of the WhatsApp conversations containing the detailed daily operations for First Response. Rather, Agent Clark references an attempt to develop a single individual into a CS. However, these efforts were ultimately not successful because this single individual was "not situated to provide an insider's view of the extortion scheme or the racketeering enterprise." (Ex. A at USAO_000088). There is no reference to any attempt to recruit any of the scores of other WhatsApp conversation participants—many of whom, from the face of the investigation, felt aggrieved and would have been more than willing to assist law enforcement.

Importantly, by virtue of their participation in the WhatsApp chat, these individuals were uniquely situated to provide an insider's view of the daily operation of First Response and the rotation scheme. Failing to explain the abandonment of this strategy after one unsuccessful attempt to recruit a CS fails the necessity standard almost by definition: either the explanation is

- 21 -

incomplete or the strategy failed because of the Investigating Agencies' own inaction. *See Lilla*, 699 F.2d at 104 ("[W]e reject generalized and conclusory statements that other investigative procedures would prove unsuccessful."

      The Investigative Agencies likewise did not attempt to introduce undercover agents. The government's generic assertion that undercover agents would fail because "[s]ome of the co-conspirators share a gang affiliation and, accordingly, are wary of outsiders and unlikely to discuss the extortion scheme with outsiders" has no basis in the actual facts of this particular investigation. (Ex. A at USAO_000086). First, this ignores the existence of the wealth of WhatsApp chats filled with outsiders from different mitigation companies. Second, this ignores the realities of the fire mitigation industry. Fires are large public events drawing first responders, on-lookers, and various commercial actors attempting to solicit business related to the fire. "Signing up a fire" requires interaction with outsiders at *every* step. Law enforcement—both overt and covert—would blend seamlessly into the chaos that is a fire in New York City.

      Additionally, the fact that Agent Clark's affidavit references an attempt to send an undercover officer to a fire on February 4, 2021 calls into question the veracity of the affidavit. (*See* Ex. A at USAO_000086). The Investigating Agencies did not even start their investigation until March 2021. (Ex. A at USAO_000059). This discrepancy raises the specter that there was, in fact, no actual use of an undercover officer. Additionally, the conclusion that this effort (assuming it was made) was not successful because Smith did not show up to the fire defies logic. Being able to pinpoint the arrival of any target of an investigation at any given fire was as simple as following the WhatsApp chat. What is confounding here is the apparent fact that  the Investigating Agencies appear to have made no attempt to get any one of the scores of participants in those chats to agree to, at the very least, permit law enforcement to monitor the

WhatsApp conversation.

The recitals in the October 14, 2021 affidavit as to the failure of normal investigative procedures were conclusory and generic in other respects as well. *See, e.g.*, *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001) ("The purged application does not meet the full and complete statement requirement of §2518(1)(c) because it makes only general allegations. . . Further, the affidavit contains boilerplate conclusions that merely describe inherent limitations of normal investigative procedures."). For example, Agent Clark concludes that physical surveillance would fail because "many of the violent acts occur at the sites of fires or at other random locations. Fires can occur at any time and in any place," is the most general of allegations and does not take into account how investigating conduct occurring at fire differs from other investigations, e.g. narcotics. (*See* Ex. A at USAO_000088).

Law enforcement agencies are also equipped, perhaps especially equipped, to arrange a rendezvous with one or "aggrieved" mitigation companies. Those companies respond to fires by listening to emergency response communications, which law enforcement is uniquely equipped to monitor as well.

Similarly, Agent Clark correctly observes that fires can occur at any time and place. Yet, somehow, teams of individuals with large trucks full of thousands of gallons of water and specialized gear are able to find these locations within minutes. Once there, these teams deploy their gear in and around the blaze in order to contain it. While some fires are relatively small affairs, others are larger engagements lasting hours. Ultimately, fire mitigation does not commence until the fire is extinguished. The reality of a fire permits law enforcement to not only know the exact location it needs to surveil, but in many cases will provide them with more than significant time to get agents and equipment in place. And critically, the nature of a fire (an

emergency) makes the presence of uniformed law enforcement officers, equipped with body cameras, commonplace.

Because the October 14, 2021 affidavit fails § 2518(1)(c)'s command to provide a "full and complete" account of the feasibility of less intrusive investigative methods the communications from the initial wiretap must be suppressed. Additionally, because it also serves as a basis for the extended wiretap, those communications must be suppressed as well. The November 12, 2021 affidavit suffers from the same defects as the October 14, 2021 affidavit. The "necessity" sections of the November 12 affidavit was – except for an account of prior Title III interceptions – identical in all material respects to the October 14 affidavit. The fruits of an unlawful, Title III interception cannot be used to support another wiretap application. 18 U.S.C. § 2515. Thus, in this case, the prior Title III interceptions – the only material additions to the "necessity" recitations in the November 12 affidavit – cannot rescue an otherwise deficient affidavit.

Even if the interceptions from the October 14 order were not suppressed, the fruitfulness of the interceptions is immaterial to the question of whether the government made a full and complete statement on necessity, such that there could be a judicial finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). In the November 12 affidavit, the government claimed that the interceptions already collected were insufficient to establish the full scope of the racketeering and extortion conspiracy. (Ex. B at USAO_000161). But the government did not give any particularity as to what the full scope of the conspiracy entails. A search for more information as to how the targets of the investigation could be endless and

cannot justify endless wiretaps. Indeed, the efficacy of the wiretaps appears to have been questionable from the onset.

> **b. Assuming *Arguendo* That the Government Established the Necessity of Extraordinary Investigative Techniques, WhatsApp's End-To-End Encryption Rendered the Wiretap Ineffective.**

"Telephonic surveillance may only be used when it is necessary to assist in law enforcement." *United States v Concepcion*, 579 F3d 214, 218 (2d Cir 2009). Courts generally uphold wiretap applications "where the nature of the offense is such that only electronic surveillance can produce the evidence necessary for conviction." *See Lilla*, 699 F.2d at 104. The logical corollary to this is that, where the nature of the offense is such that electronic surveillance cannot produce evidence, courts should deny wiretap applications.

Here, the wiretap application omitted information about the impact of WhatsApp's end-to-end encryption on the necessity of the wiretap. By ignoring the WhatsApp Chats, Agent Clark omitted the importance they played in the day-to-day operation of First Response and the alleged rotation extortion scheme. On March 2, 2021 the Government possessed a forensic copy of Smith's iPhone. On April 9, 2021 a search warrant authorized the search of that forensic copy. The Title III application was made on October 14, 2021. The Investigating Agencies had 188 days to investigate, examine, and analyze the data contained therein.

The forensic copy of Smith's iPhone revealed that 79% of the messages on that device were sent/received using the WhatsApp Messaging Application. This application is known to use end-to-end encryption that prevents the government from reading message contents—even with a wiretap authorization. The briefest review of the messages and group chats on the forensic copy of Smith's iPhone would have quickly and easily demonstrated that First Response used

WhatsApp in its daily operations—including to determine who was next up to receive a job. The four large group WhatsApp chats contained on the forensic copy all were encrypted end-to-end and were used to coordinate the daily operations of First Response and the rotation system.

Wiretap interception began on October 15, 2021. On that day alone, the "chat" was referenced three distinct times. Over the next fifty-eight days the target subjects of the wiretap referenced the WhatsApp chat 125 times—specifically that it contained operational information related to fire mitigation and the alleged rotation system.  These conversations demonstrate that the daily operations of First Response and the alleged rotation system were almost exclusively contained in the end-to-end encrypted group chat. As discussed above, prior to applying for a wiretap the Investigating Agencies possessed these encrypted chats on the forensic copy of Smith's phone.

Despite the tens of thousands of messages on the forensic copy of Smith's iPhone and the hundreds of references to the "chat" generated by the wire, Agent Clark omitted all but the briefest reference to these chats in the October 14 Affidavit, extension, and periodic reports. Wiretapping is an "extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974). Because that exceptional intrusion is triggered by the government's use of an *ex parte* application process, interposing a neutral and independent decisionmaker between the individual and the "officer engaged in the often competitive enterprise of ferreting out crime" is imperative. *See Johnson v. United States*, 333 U.S. 10, 14 (1948).

Title III's requirement that the government provide the authorizing court with a "full and complete statement of the facts and circumstances" establishing probable cause for and the necessity of such an intrusive investigatory device are the backbone of the statute's requirement

that "[t]he district judge, not the agents, must determine whether the command of Congress has been obeyed." *United States v. Spagnuolo,* 549 F.2d 705, 711 (9th Cir. 1977). Unless the government sets forth the relevant facts and circumstances comprehensively and candidly, the court cannot make the "independent evaluation of the matter" that both Title III and the Fourth Amendment require. *Franks v. Delaware*, 438 U.S. 154 (1978); *see United States v. Gigante,* 538 F.2d 502, 503 (2d Cir. 1976) (Title III was designed "to ensure careful judicial scrutiny"). And, of course, "when the Fourth Amendment" and Title III "demand[] a factual showing," the "obvious assumption is that there will be a *truthful* showing" by the government. *Franks,* 438 U.S. at 164-165 (quotation omitted) (emphasis in original). The use of intentionally or recklessly false statements in wiretap affidavits is "an unthinkable imposition" on the ability of the court to determine independently whether the requirements of Title III are met. *Id.* at 165.

To enforce Title III's stringent requirements, Congress enacted a distinct statutory rule of suppression that supplements the "judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *United States v. Giordano*, 416 U.S. 505, 524 (1974). Title III's statutory suppression rule mandates the exclusion in court proceedings of "the contents of any [wiretap], or evidence derived therefrom" if the wiretap evidence "was unlawfully intercepted," 18 U.S.C. § 2518(10)(a)(i). Wiretap evidence is unlawfully intercepted "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527. Because the "full and complete statement" provisions "play a central role in the statutory scheme," suppression "must follow when," as here, those provisions "ha[ve] been ignored" by the government." *Id*. at 528.

**III.     Jackson Joins in Co-defendant's Motions.**

Defendant Jackson joins in his co-defendant's motions.

## CONCLUSION

For the foregoing reasons, the Court should suppress all of the intercepted conversations obtained by the government from Smith and Jackson's cell phones pursuant to the Applications, Affidavits and Orders dated October 14, 2021 and November 12, 2021, as well as all evidence derived therefrom.

Dated:        Brooklyn, New York
              February 13, 2023

                                        Respectfully submitted,

                                        *Susan G. Kellman*

                                        Susan G. Kellman, Esq.
                                        Ezra Spilke, Of Counsel
                                        Chris La Tronica, Of Counsel
                                        25 Eighth Avenue
                                        Brooklyn, NY 11217
                                        718-783-8200
                                        sgk@kellmanesq.com
                                        ezra@spilkelaw.com
                                        cmlatronica.law@gmail.com
TO:      DAMIAN WILLIAMS, ESQ.         Attorneys for Sequan Jackson
         United States Attorney
         Southern District of New York

Attn:    Adam Hobson, Mollie Bracewell
         Rushmi Bhakaran, Eliz. Espinsoa.
         Assistant United States Attorneys

- 28 -