# EXHIBIT D

MBA1LACC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          22 Cr. 352 (JSR)

5   RAHMIEK LACEWELL,

6              Defendant.                  Conference
    ------------------------------x
7
                                           New York, N.Y.
8                                          November 10, 2022
                                           11:31 a.m.
9

10  Before:

11                    HON. JED S. RAKOFF,

12                                         District Judge

13
                         APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  RUSHMI BHASKARAN, ESQ.
         ELIZABETH A. ESPINOSA, ESQ.
17       Assistant United States Attorneys

18  MAYER BROWN LLP
         Attorneys for Defendant
19  BY:  GLEN A. KOPP, ESQ.

20  WEIL GOTSHAL & MANGES LLP
         Attorneys for Defendant
21  BY:  MICHAEL P. HEFFERNAN, ESQ.

22  ALSO PRESENT:  VIOSANNY HARRISON, Pretrial Services Officer

23

24

25

MBA1LACC

1          (Case called)

2          THE DEPUTY CLERK:  Will everyone please be seated, and

3   will the parties please identify themselves for the record.

4          MS. BHASKARAN:  Good morning, your Honor.  Rushmi

5   Bhaskaran and Elizabeth Espinosa for the government.  We're

6   joined at counsel table by pretrial services officer Viosanny

7   Harrison.

8          THE COURT:  Good morning.

9          OFFICER HARRISON:  Good morning.

10          MR. KOPP:  Good morning, your Honor.  Glen Kopp of

11   Mayer Brown LLP, along with Michael Heffernan of the Weil

12   Gotshal firm.  We're here on behalf of the defendant Rahmiek

13   Lacewell.  Good morning, your Honor.

14          THE COURT:  Good morning.

15          All right.  We're here on the renewed motion for

16   release on bail.  So let me hear first from defense counsel.

17          MR. KOPP:  Thank you, your Honor.

18          Just before we start, I just want to let you know that

19   Mr. Lacewell's father, James Lacewell, is here in the

20   courtroom, and he is proposed to have Mr. Lacewell live with

21   him if we can get him out on bail.

22          And the reason why we're here, your Honor, is that

23   back in July, your Honor decided bail argument and detained

24   Mr. Lacewell primarily on concerns that there were not

25   conditions sufficient that could be set to assure the

1    reasonable safety of the community.  Since that time, defense

2    counsel has received significant amount of discovery.  We've

3    been able to review, get through some of that discovery, and

4    we've been able to review some of the relevant issues that were

5    I think top of mind for your Honor at the time of the bail

6    decision.  And at that time, your Honor, the focus, I believe,

7    from the transcript, of your concerns --

8              THE COURT:  By the way -- just forgive me for

9    interrupting -- do I understand correctly that Mr. Lacewell,

10   although he originally elected to go to trial on November 28th,

11   has now elected instead to go to trial on May 1st?

12             MR. KOPP:  That's correct, your Honor.

13             THE COURT:  Go ahead.

14             MR. KOPP:  And so at the time, the decision or the

15   determinations your Honor made on bail were focused on sort of

16   two points.  One was your Honor's discomfort with

17   Mr. Lacewell's prior criminal record, that in your Honor's

18   view, it suggested a continued pattern of criminal conduct; as

19   well as the incident in October of 2021 in which Mr. Lacewell

20   was allegedly present in which there was, as the government

21   describes it, a vicious assault.  And so that's been sort of

22   the two focal points of the decision.

23             THE COURT:  Right.  So I gather from your letter that

24   you think he was not involved in that assault, although he was

25   present at the scene.  I haven't looked at the videos, but do

MBA1LACC

1    they show what, if anything, he was doing?

2              MR. KOPP:  So, your Honor, I'll take one step back

3    even further from the incident itself and the videos is that

4    there are wire interceptions your Honor is probably aware of in

5    this case, and the wire intercepts prior to that day indicate

6    and show other co-defendants dealing with the owner of that

7    home, who was complaining about the fact that there was

8    insufficient tarps put up and insufficient protection of the

9    home that had already been damaged in a fire.  And she's

10   complained that the work being done was not protecting the

11   house.  And so leading up to this day, there's a real dispute

12   over who had been properly taking care of the home.  No

13   indication that Mr. Lacewell was at the house the following day

14   to do anything other than what he had previously been doing,

15   which is overseeing work at the home, after the demolition

16   comes in, helps with cleanup, helps oversee crews that work on

17   machines to clean up the house and make sure it can be put back

18   together.

19             So there's -- leading up to this incident, there is a

20   dispute that does not involve Mr. Lacewell, but there's the

21   owner of the home who is concerned about how the home is being

22   taken care of.  So the next day, Mr. Lacewell is there, and

23   there's even wire intercepts describing the fact that he's

24   there to walk through the house to see the damage.  And he's

25   there to work.  He's not there to do anything other than his

MBA1LACC

```
 1   job.
```

 2          What does ensue is that there is some sort of incident

 3   between members of the First Response team and the contracting

 4   team, who, at some point while work is going on —— the video

 5   shows people coming in and out of the house, there's work being

 6   done —— there's an incident.  Mr. Lacewell is, from what we can

 7   see, is present during the incident, as are many other people

 8   in the street, sort of surrounding —— you can't see what

 9   exactly happens.  There is a car in the street that is blocking

10   the camera.  But Mr. Lacewell is present —— from the video, at

11   least —— and there are many other people present, and there is

12   what appears to be some sort of discussion.  The allegations

13   are that one of the co-defendants strikes one of the

14   contractors during that discussion.  That is the extent of the

15   assault.  And there's an allegation that somebody takes a

16   picture —— not Mr. Lacewell, from what we understand; we don't

17   see him do this.  Someone takes a picture of the victim's

18   identification during the course of that.  We see in the video

19   later on, the police come.  The individual does not go to the

20   hospital, from what we understand, and there's some reports of

21   some of the injuries.  But that's it.  Mr. Lacewell was there

22   that day to do what he had been doing, which is go to work and

23   help fix up that house.  There is an incident, the contractor's

24   team is there during the incident, and the First Response

25   people are there during the incident.

MBA1LACC

1          THE COURT:  I have a lot of other questions for you,

2    but let me put you on hold for a minute and just hear from the

3    government about that incident.

4          MS. BHASKARAN:  Thank you, your Honor.

5          It is our understanding, based on witness testimony,

6    that Mr. Lacewell was one of the enforcers of this violent

7    crew, and with respect to the October 21st incident -- excuse

8    me -- the October 18, 2021 incident, it's our view that he

9    wasn't just there to do legitimate work, he was there in his

10   capacity as an enforcer of this violent crew.  So what

11   happened --

12         THE COURT:  Well, is that based on the testimony of

13   one witness, several witnesses?  Were they persons who were

14   present?  Give me some more specifics.

15         MS. BHASKARAN:  Certainly, your Honor.

16         So I think a lot of this bears out in the same video

17   that Mr. Kopp just described.  What happens is, as we see in

18   the video, the video is -- it's outside of the job site where

19   this dispute occurs.  The first thing that happens is, a member

20   of the First Response team takes one of the cars and blocks

21   this dead end lane where this house was, so as to prevent

22   anyone from leaving.  Mr. Lacewell then arrives in his car.  He

23   arrives wearing his red First Response sweatshirt.  You then

24   see Mr. Lacewell approach his car and take off his sweatshirt

25   and then he's now wearing all black.  And we expect that there

MBA1LACC

```
1   will be witness testimony that when there was going to be an
2   enforcement by this crew, when there was violence, they put on
3   their "blacks."  And that's what you see Mr. Lacewell do.  He
4   takes off his red First Response sweatshirt, appears to put it
5   in his car, and then walks back to the scene, where a
6   particular roofer, who was working for this construction crew,
7   was waiting outside.  And again, the roofer is basically
8   blocked from leaving because someone has taken a van and turned
9   it so as to block that lane.  Then a group of people --
10              THE COURT:  And that's the vehicle Mr. Lacewell came
11  in?
12              MS. BHASKARAN:  No.  He came in a different car.  He
13  literally moved that van after we believe the assault occurred.
14  So again, it's a group of men working in concert.  One blocks
15  the lane.
16              THE COURT:  All right.
17              MS. BHASKARAN:  So then you see a group of men
18  standing outside.  You can't see the assault, but you see that
19  there's something going on.  At one point it looks like -- you
20  see someone, the victim, hand his wallet or something over to
21  someone.  We also have a picture of that ID on Jatiek Smith's
22  phone which we recovered.  An assault occurs.  The roofer is
23  punched I believe twice in the face.  His nose is bleeding.  He
24  reports that there's blood on the ground, blood on the car.
25  Someone tells him to wipe the blood off the car.  And it looks
```

MBA1LACC

1  like Mr. Lacewell might be handed a towel at one point,

2  presumably to wipe up the blood from that scene.  So throughout

3  the scene, Mr. Lacewell is certainly there.  No one disputes

4  that he's there.  And he's standing there in his blacks with

5  all the other First Response members standing there, in the

6  show of authority.

7        And I think it's worth noting, your Honor, that this

8  witness, this particular witness, is absolutely petrified, and

9  this is a witness that we're having significant trouble finding

10 before trial because he is so afraid.

11       THE COURT:  I remember hearing that in a prior bail

12 application.

13       So let me go back to defense counsel.  So that doesn't

14 sound like Mr. Lacewell just happened to be there.

15       MR. KOPP:  Well, your Honor, again, the calls leading

16 up to this incident speak to the fact that there was a dispute

17 about bad work being done at the house.  Mr. Lacewell's job is

18 to oversee cleanup following demolition work.  He shows up in

19 his red sweatshirt; he shows up and pulls up to the side of the

20 street.  He doesn't block anybody in.  And he shows up in his

21 red sweatshirt.  So if he's there as an enforcer, why is he

22 showing up in his red sweatshirt as opposed to blacks, as they

23 say?  That doesn't square.

24       THE COURT:  I'm not following you there.  The

25 government says he shows up in his red sweatshirt and then he

MBA1LACC

1    takes it off prior to the assault.

2              MR. KOPP:  Okay.  But my point is that he was there to

3    do his job, which is to clean the house.

4              THE COURT:  Then why did he take off his sweatshirt?

5              MR. KOPP:  I don't know, your Honor.  I don't know why

6    he took off his sweatshirt, but I don't think that him taking

7    off his sweatshirt creates a situation in which he is a danger

8    to the community.  Everyone there may have taken off their

9    sweatshirts.

10             THE COURT:  All of this is of course circumstantial,

11   but the allegation is that that's a signal that now we're no

12   longer operating a business, now we're operating an enforcement

13   of our allegedly illegal activities.  So why shouldn't I draw

14   that inference?

15             MR. KOPP:  Well, your Honor, my concern and why I

16   don't think that inference is proper here is that this is a

17   year into his work there.  They are -- the government has

18   focused on one incident that they can point to where he is

19   present, and there's no -- and they have wiretaps of his

20   associates —- alleged —- his alleged co-defendants here.

21   Nothing indicates here that he is being told there's going to

22   be an assault here, you need to be here because you need to

23   look tough and help us beat this guy up.  What it shows is that

24   he's there to do work, and if something happened, if there's an

25   incident that happened, that occurred on the spot, without him

1    preparing or expecting to be there, and somebody said, take off

2    your sweatshirt.  I understand the inference that may be drawn

3    here, your Honor, about this one incident, an incident that, I

4    think it's important to note, your Honor, comes nearly a year

5    into his work there.  So it's not that there are -- what we

6    have not seen from the government is him being associated with

7    other violent incidents.  And so I think that that inference is

8    weak, your Honor, and I think it is not sufficient.

9              But we're here to talk about whether the government

10   can carry its burden on bail.  And the other issue I think

11   that's important as we talk about that incident is that the

12   folks who are allegedly the leaders of this crew, one is in

13   jail awaiting trial in a few weeks, the other is out on home

14   detention, and there are others in this group that are on home

15   detention.

16             THE COURT:  Well, I have released two persons after

17   detailed consideration of the facts specific to those

18   individuals.  All of this has to be individual.  And that's why

19   I'm focusing on the evidence that's individual as to

20   Mr. Lacewell.

21             Now there was something else in your letter that I

22   relied on, which is his prior record, and I want to make sure I

23   have it right.  I'm looking at the pretrial services report.

24   His first conviction arose from a charge when he was 18 in

25   2004.  The charge was both forcible rape and statutory rape,

MBA1LACC

1    but it appears that he pled to statutory rape, and nevertheless

2    was sentenced to one to three years.  And an order of

3    protection was issued, which perhaps inferentially shows that

4    this was not a matter of true romance.

5           Then the next item is a few months later, in 2004.

6    Again, it appears the charges were both statutory sex offenses

7    because the victim was under 18 but also the charges were, for

8    example, intercourse with another without consent.  However, he

9    pled guilty to what appears to have been in effect a statutory

10   sexual offense and received a sentence on the same day as the

11   previous sentence of 18 to 54 months.

12          Then a few years later, he was convicted on possession

13   of marijuana and sentenced to time served.  That doesn't appear

14   to be of great moment.

15          Then in the year after that —- we're now up to 2010 —-

16   he pled guilty to false personation.  It's unclear what that

17   involved.

18          Then, also in 2010, he was charged with attempted gang

19   assault in the first degree.  He pled guilty to the lesser

20   offense of attempted reckless endangerment, but that does sound

21   like it could have been quite serious.  It also sounds like it

22   was gang related.  He was sentenced to 18 months to three

23   years.

24          Then in September 2010, he was charged with attempted

25   murder, but that was ultimately consolidated with another case.

1  Well, it's unclear what it was consolidated with from this

2  report.

3          Then in 2014, now having served some time, he's been

4  released.  He's 29; he's no longer a kid.  He is convicted of

5  criminal sale of a controlled substance.  It's unclear what the

6  substance was.  But he was sentenced to 42 months.

7          And then in 2021, just a year ago, he was charged with

8  possession of a forged instrument, aggravated unlicensed

9  operation of a motor vehicle, and he pled guilty to disorderly

10 conduct: "fight/violent behavior."

11         Now I gather you had some question about the accuracy

12 of that latter matter, but what about all the rest?

13         MR. KOPP:  Your Honor, I think we have to take that

14 all head on.  Mr. Lacewell is 37 years old.  There is gray in

15 his beard, and it is not an aesthetic decision.  He is a more

16 mature, thoughtful person than he was back in the day.  Now the

17 29-year-old him is not the 37-year-old him.  He started a

18 family.  He has a 2-year-old who just had his birthday

19 yesterday.  During COVID, he continued to work for 1540

20 Productions, notably, a company that hired in him in 2012,

21 continued to employ him despite his criminal history; continues

22 to want to work with him because of the kind of person he is

23 and the kind of worker he is for them.  And he lost that job

24 during COVID because no one was putting on movie premieres

25 during 2020.  And someone with that kind of record, as you can

1    imagine, during COVID, is going to struggle to find work.  He's

2    going to struggle to support his family.  He got a job from a

3    friend.  That is ultimately what happened here.  But this is

4    not the same person who committed those crimes in terms of his

5    security level and what he was doing with his life when he got

6    out in 2017.  His record since 2017 is full of tinted window

7    charges and suspended license charges; silly stuff.  Not

8    someone who presents a danger to this community, your Honor.

9    He has learned from that.  We have the fight of his life on his

10   hands now.  He will not get out of line if he is released.  I

11   am confident in that.  He has family support.  His father is

12   here, your Honor.  His father is an amazing example for him.

13   His father has been through the system.  His father has been

14   out of prison now for at least seven years.  His father owns a

15   single-family home in Staten Island, and he's a shining example

16   of someone who can turn things around.  And I think

17   Mr. Lacewell is ready for that, and he's ready to work with us

18   to fight this trial and these charges.  But I do not believe,

19   your Honor, that that prior criminal history should prevent him

20   from being home with his family until that trial starts.  And

21   this is a different man, and --

22            THE COURT:  Well, so let me just inquire a little

23   further.  So it's one thing to commit offenses when you're 18,

24   19.  Doesn't make any of that right, but the neuroscience is

25   clear that one doesn't have the same self-control at that age.

MBA1LACC

```
 1   But what was the substance involved in the 2014 plea to
 2   criminal sale of a controlled substance?  What was the
 3   substance?
 4          MR. KOPP:  My understanding, your Honor, was that was
 5   a cocaine case.
 6          THE COURT:  Okay.  So at least at that point in his
 7   life, and he had just gotten out of prison, he had not learned
 8   his lesson.  He went back to criminal activity.  Now you make a
 9   good point about things that have occurred in the last couple
10   of years.  With respect to the plea of guilty in 2021, what was
11   the "fight/violent behavior"?
12          MR. KOPP:  Your Honor, we are completely at a loss to
13   explain what that was.  We have no information to indicate that
14   that was relevant at all or that it's even proper, because he
15   gets pulled over for tinted windows.  None of the charges
16   relate to --
17          THE COURT:  I know.
18          MR. KOPP:  -- any violence, and he pleads to a
19   conditional discharge, which would seem to be an odd result for
20   any violence.
21          THE COURT:  Well, I agree with that.  I mean, that
22   cuts in your favor.
23          What was the forged instrument?  He didn't plead to
24   that, but what was the nature of that allegation, if you know?
25          MR. KOPP:  It was an expired license plate, your
```

Honor.  I think one of the reasons why he got pulled over is
that it was like a paper plate that was flapping, so it wasn't
properly shown on the back of the car, and that was the
reasoning.

THE COURT:  All right.  Again, I'm going to interrupt
you for a second.

Let me ask the government:  So other than the
seemingly nonviolence, despite the indication in the rap sheet
offense of last year, do you dispute anything that the defense
just said about his prior criminal activity?

MS. BHASKARAN:  Well, your Honor, I think the question
the Court needs to ask is:  Has anything really changed since
2017 since he's been released from prison?  The significance of
his most recent arrest in 2021 I think for us is really what he
said on the wire after he was arrested.  He had to call one of
his co-defendants, where they expressed worry that they're
going to be indicted because phones were seized at the time of
that arrest.  I think that speaks to consciousness of guilt,
that he was concerned that he was involved in criminal activity
at the time.  So I wanted to point that out.  The other --

THE COURT:  I'm sorry.  I'm not quite sure I follow
what you're saying here.  So what was on this call?

MS. BHASKARAN:  So the defendant is arrested in
approximately November of 2021.  At the time we had wires on
two of his co-defendants' phones.  After he's arrested, when

MBA1LACC

1    he's arrested, some of his cellphones are seized.  And then

2    he's intercepted on the call with one of his co-defendants

3    talking about how he's arrested, talking about how his phones

4    were seized by the police, and then they discuss how they're

5    worried about there being indictments coming or people are

6    going to get indicted.  And so I think that says something --

7    speaks to some consciousness of guilt of there being some

8    criminal activity that was --

9              THE COURT:  Well, I think that's a fairly modest --

10   I'm not concerned particularly about flight risk, although I

11   want to get back to that in a minute with defense counsel, but

12   I am concerned about danger to the community, and that

13   particular call doesn't seem to state anything other than the

14   obvious, which is, uh-oh, we're going to get indicted.

15             Let me, again, go back to defense counsel for a

16   minute.

17             The other two people I released recently, I released

18   to home incarceration, because I think there is a reasonable

19   concern here not just about flight but, more importantly, about

20   witness intimidation.  Your proposal is, however, that he be

21   released to home confinement so that he can work.  And I can

22   understand what a reasonable request that is from the

23   standpoint of supporting himself and others, but it doesn't

24   carry the same assurance against intimidation that home

25   incarceration does.  So I take it, if he were released, you'd

MBA1LACC

1    be willing to agree to home incarceration.

2              MR. KOPP:  That's correct, your Honor.

3              THE COURT:  All right.  So let me come back to the

4    government.

5              I think, if I understand the government's position, it

6    rests on three prongs:

7              First is a prior history of sometime violent behavior,

8    but that seems to be fairly old stuff.

9              Second, there's, of course, the overall assertion that

10   this entire gang was involved in violent behavior.  But that

11   doesn't relieve the Court from its obligation to look at each

12   individual individually.

13             The third item and the one that I think gives me the

14   most pause, now that we've had this additional discussion, is

15   the inference that the government argues for of his

16   involvement, albeit not the person who threw the punches, but

17   his involvement nevertheless in the enforcement activity, which

18   notwithstanding very able defense counsel's arguments, I think

19   can reasonably be inferred from the set of circumstances you've

20   described, such as taking off the red shirt so that he was in

21   blacks, ready for action, or ready for having others commit

22   enforcement action, which is, of course, at the heart of this

23   case in some respects.  So it's that last item that's giving me

24   the most pause.

25             But let me hear first from the government if there's

MBA1LACC

1    anything else you wanted to bring to my attention, and then

2    I'll hear from defense counsel.

3              MS. BHASKARAN:  Yes, your Honor.

4              There's a bit more color that I want to add to the

5    defendant's criminal history and some of his recent conduct

6    that I think might bear on the Court's assessment of this

7    defendant.  With respect to his prior convictions, I think it's

8    worth noting that many of those cases were cases in which

9    Jatiek Smith was also a co-defendant and also involved in the

10   conduct that was charged.  And that goes back to those sex

11   offenses from when he was in his late teens.

12             THE COURT:  You raise a good point.  I meant to ask

13   you before and I forgot —— you had asserted in the prior

14   hearing, if I remember correctly, that he's a member of the

15   Bloods ——

16             MS. BHASKARAN:  Yes.

17             THE COURT:  -- which is, I think the Court can

18   virtually take judicial notice, a very violent gang.  That's

19   disputed by the defendant.  What's your evidence of that?

20             MS. BHASKARAN:  So in 2014, I believe when he was

21   incarcerated for that narcotics offense that we've discussed,

22   he admitted upon his admission that he was a member of the

23   Bloods gang.  That was in 2014, we understand, but in addition,

24   we have seen social media messages between Jatiek Smith and

25   another individual, where they say, in sum and substance:  Tell

MBA1LACC

1    Ready, which is this defendant's alias, happy G day, which we

2    understand -- our gang experts say it's happy gang day, a

3    celebration of one's joining a gang, and that was in I

4    believe --

5            THE COURT:  Is this going to be added to the long,

6    ever-growing list of national holidays?

7            MS. BHASKARAN:  So that was in 2021.  So for that

8    reason, we do believe that there is a longstanding association

9    with the Bloods gang.

10           I'd also note that during our takedown, we recovered

11   Bloods literature from another defendant's home -- this is

12   Sequan Jackson's home -- and in that literature there is

13   reference to this defendant's being a Blood.  That document, as

14   I can remember, is not dated, so I can't say how recent it was,

15   but it's there.  So I wanted to raise with the Court our

16   concern about the defendant's association with the Bloods.

17           With respect to his criminal history, several of those

18   convictions are convictions where Jatiek Smith was also a

19   co-defendant.  It's worth noting that they have a longstanding

20   bond.  This defendant was arrested at Jatiek Smith's home,

21   which is perhaps a slightly secondary point, but I think it

22   speaks to his character.  At the time --

23           THE COURT:  No, it's not irrelevant.  It's relevant.

24   In any of these cases where there are multiple defendants, I

25   think it's very important for the Court to look at the

1  individual.  For example, to take a hypothetical that has

2  nothing to do with this case whatsoever, there are mob cases

3  where people are indicted who committed murder, people are

4  indicted who ordered murders, and then people are indicted who

5  served as money launderers or accountants or whatever and

6  weren't involved in the murders at all.  Those people are often

7  entitled to bail because they're not really a danger to the

8  community.  Yes, they were part of an enterprise, but that

9  isn't sufficient to deny them their constitutional right to

10 bail.  So I'm not overwhelmed, but I take your point that his

11 relationship to the leader of this gang goes back some time,

12 but I'm not sure what I infer from that.

13         MS. BHASKARAN:  Well, your Honor, I think it's

14 corroborative of the fact that we allege that he's one of the

15 enforcers of this operation, and here we have a longstanding

16 relationship between this defendant and the leader of the crew

17 that goes back to when they were teenagers and includes a

18 history of violent offenses.  And I think when you share that

19 type of criminal bond with someone, an inference could be drawn

20 that this is the type of person who would be an entrusted

21 enforcer of a violent crew.

22         There's only one other point that I wanted to make,

23 your Honor —— and I'm happy to answer any questions you have ——

24 which is the circumstances of the defendant's arrest.  The

25 defendant was arrested at Jatiek Smith's home.  My

MBA1LACC

1   understanding is that when the FBI announced their presence,

2   they announced that they were FBI, search and seizure, per FBI

3   protocol, there's something called a flashbang that is ignited

4   outside —— it's like a firecracker —— to alert whoever's inside

5   that the FBI are outside.  My understanding is what happened

6   was Mr. Lacewell opened the door, peered out, saw that the FBI

7   truck was there, and it's after they announce themselves as FBI

8   and they're wearing FBI gear that one would wear for a search.

9   He peers out and, from what I understand, he then runs out,

10  down an alley, towards a neighbor's yard, and is hiding in a

11  bush, and the FBI had to run and go in there —— which was

12  potentially quite dangerous —— in order to effectuate his

13  arrest.

14          THE COURT:  All right.  I'll be interested to hear

15  what defense counsel has to say about that.  Thank you very

16  much.

17          MR. KOPP:  Your Honor, I guess I'll take the last

18  point first, and I don't know that that's super relevant as to

19  the issue of danger to the community.  I think we've already

20  established, or satisfied --

21          THE DEPUTY CLERK:  Can you pull the microphone closer

22  to you.

23          MR. KOPP:  Sorry, Linda.  Sure.

24          The last point first.  It really doesn't go to danger

25  to the community.  I don't know what alleyway they're referring

MBA1LACC

1    to, but I do know from my client that there were flashbangs

2    that were thrown at the apartment and so he was naturally

3    concerned about that.  I don't think the government knows that

4    he knew that there were FBI agents there to arrest him.  I

5    don't know at that time that it was clear at all, other than

6    that there were flashbangs being thrown at the house.

7               THE COURT:  Well, I thought the government indicated

8    that he opened the door and there were people in FBI uniforms.

9               MR. KOPP:  I don't know that that's true, your Honor.

10   We would dispute that.

11              THE COURT:  I have a feeling -- well, okay.  I mean,

12   it's not unusual for the FBI to appear all in black, so I don't

13   think that happened in this case.  Drawing a superficial

14   analogy to another aspect of the case.

15              MR. KOPP:  Fair enough.

16        I do believe they usually come -- and I can ask my

17   colleague, who's a former head of that unit -- that they often

18   come early in the morning, and it is often dark outside.  And

19   so I don't know if that was the circumstances here, but I

20   believe that's correct.  And they're not there to casually wake

21   someone up so that they can get their wits about them and then

22   have a discussion.  They're there to catch them at a vulnerable

23   spot and make an arrest.  So I don't know that that is really

24   relevant here, especially to the violence question.

25              The other issue that the government raised is the

MBA1LACC

1    Bloods association.  Their evidence really stops as to this

2    defendant in 2014.  That is the end of his Bloods association

3    at best, if not earlier.  And surviving jail sometimes requires

4    associating with gangs.  But all they have is hearsay, wholly

5    unrelated to this defendant, who they have on wires,

6    apparently, but no evidence on the wires that he's associating

7    with Bloods or makes any Bloods statements or anything to that

8    effect.  No photographs of him, you know, making Bloods signs

9    or anything like that.  So I think that's weak, and does not

10   tie him to any sort of violence in this case.

11           The idea that he was at Jatiek Smith's home at the

12   time of the arrest, he was renting an apartment in the

13   basement.  He had been renting an apartment in the projects and

14   the sublease -- the lessor or his subleasee, two weeks prior,

15   had raised his rent, and living in the projects versus living

16   in an apartment with a heated floor for the same price was a

17   pretty logical change that he made.  That is the extent of why

18   he's in that apartment.  And the basement apartment that was

19   being leased out -- he's not there -- and his apartment was

20   ransacked and searched very thoroughly.  No evidence in that

21   search of gang involvement.  What was found there was somebody

22   living their life, turning their life around, and there was

23   baby toys in there for his 1-year-old, now 2-year-old.  That's

24   what was in his apartment in that building, in Jatiek Smith's

25   home.  Yes, they've known each other for a long time.  That

MBA1LACC

1   does not make him violent anymore.

2              THE COURT:  All right.  So most times when I'm

3   considering bail applications I rule from the bench because

4   it's important for all concerned to have a prompt ruling.  But

5   I think this is a close case, and I think I want to think about

6   it for another day or so.  So I will get you a ruling no later

7   than close of business Friday, day after today.  So the matter

8   is adjourned till then.

9              MR. KOPP:  Thank you, your Honor.

10             THE COURT:  Thanks a lot.

11             THE DEPUTY CLERK:  All rise.

12                            o0o

13

14

15

16

17

18

19

20

21

22

23

24

25