UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **22 Cr. 352 (JSR)** |
| JATIEK SMITH, *et al.*, | |
| Defendants | |

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Rushmi Bhaskaran
Mollie Bracewell
Elizabeth A. Espinosa
Assistant United States Attorneys
*– Of Counsel –*

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ................................................................... 1

II.  RELEVANT FACTS ............................................................................... 2

   A.   Industry Background .................................................................... 2

   B.   The Enterprise ............................................................................. 3

III.  THE PROFFERED EVIDENCE IS ADMISSIBLE AS DIRECT EVIDENCE OF THE RACKETEERING ACTIVITY, ENTERPRISE, AND CONSPIRACY, AND AS PROOF OF MOTIVE .................................................................................................. 9

IV.  THE COURT SHOULD PERMIT REFERENCES TO THE DEFENDANTS' BLOODS MEMBERSHIP .................................................................... 13

   A.   Applicable Law .......................................................................... 13

   B.   Discussion .................................................................................. 15

V.   THE COURT SHOULD ADMIT BRIEF REFERENCES TO SMITH'S PRIOR AND CURRENT INCARCERATION .................................................................. 17

   A.   Relevant Facts ........................................................................... 17

   B.   Applicable Law .......................................................................... 17

   C.   Discussion .................................................................................. 18

VI.  THE COURT SHOULD ADMIT CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE CONSPIRACY UNDER RULE 801(d)(2)(E) .......... 19

   A.   Relevant Facts ........................................................................... 20

   B.   Applicable Law .......................................................................... 21

   C.   Discussion .................................................................................. 23

VII.  THE COURT SHOULD PRECLUDE EVIDENCE ABOUT EARLIER NON-FIRST RESPONSE INDUSTRY VIOLENCE AS IRRELEVANT ............................... 25

VIII.  THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE DEFENDANTS WERE SELECTIVELY PROSECUTED ............................... 26

IX.  THE COURT SHOULD LIMIT THE SCOPE OF CROSS-EXAMINATION FOR A VICTIM WITNESS ..................................................................................... 27

   A.   Applicable Law .......................................................................... 27

   B.   Discussion .................................................................................. 30

X.   THE COURT SHOULD ADMIT EVIDENCE OF SMITH'S CONDUCT AT THE TIME OF HIS ARREST AS CONSCIOUSNESS OF GUILT .......................... 31

   A. Applicable Law ........................................................................... 32

   B. Discussion ................................................................................... 33

XI.  THE COURT SHOULD ADMIT, AS AN EXCITED UTTERANCE, A STATEMENT OF A VICTIM THAT WAS MADE TO A RESPONDING POLICE OFFICER .... 34

A. Applicable Law ........................................................................................................... 34

B. Discussion .................................................................................................................. 35

XII.    BUSINESS CERTIFICATIONS ARE APPROPRIATE TO ESTABLISH THE AUTHENTICITY OF CERTAIN BUSINESS RECORDS. .................................................... 36

XIII.   CONCLUSION ......................................................................................................... 37

## I.   PRELIMINARY STATEMENT

In advance of the May 1, 2023 trial in this case, the Government respectfully submits the following motions *in limine*.  The Government moves for the following *in limine* rulings:

- admitting evidence of the racketeering activity, the enterprise, and conspiracy charged in the Indictment;

- admitting evidence of the defendants' gang membership in the Bloods, which was used to further the goals of the racketeering and extortion conspiracies;

- admitting brief reference to defendant Jatiek Smith's prior and current incarceration;

- admitting co-conspirator statements made in furtherance of the conspiracy, under Federal Rule of Evidence 801(d)(2)(E);

- precluding improper argument or evidence about violence in the industry prior to the charged conspiracy;

- precluding improper argument or evidence that the Government is selectively or vindictively prosecuting the defendants;

- limiting the scope of cross-examination of a victim witness;

- admitting evidence about defendant Jatiek Smith's conduct at the time of his arrest as consciousness of guilt;

- admitting, as an excited utterance, a statement of a victim to a responding police officer; and

- authenticating certain records at trial as business records through appropriate business record certifications.

## II.   RELEVANT FACTS

The defendants are charged with racketeering conspiracy and extortion conspiracy for their participation in activities, including violence and threats of violence, through which they seized control of the fire restoration industry in the New York City area.  For this conduct, the defendants are charged in a two-count Indictment with participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and an extortion conspiracy, in violation of 18 U.S.C. § 1951.

### A.   Industry Background

The fire restoration industry involves businesses that mitigate damages and undertake repairs resulting from fires.  The industry includes both emergency mitigation service ("EMS") companies and public adjusters, both of which are hired by the property owner.  EMS companies clean up the damaged property, which includes sweeping up, removing debris, and ventilating the property.  Public adjusters, which are independent contractors licensed by the state, investigate, process, submit, and negotiate insurance claims with insurance carriers.  Property owners pay the public adjuster with a percentage of the settlement paid out by the insurance carrier on the claim.

EMS companies compete to sign projects (or "losses") by approaching a property owner directly.  One way EMS companies compete for work is by arriving on the scene of a fire soon after it has occurred, sometimes called "chasing a fire."  Losses can involve either the home that caught on fire (often referred to as the "main") as well as adjacent properties that were exposed (the "exposure" or "expo") to the fire and sustained indirect damage.  If a property owner hires a particular EMS company, the EMS company will often make a referral for a particular public adjuster to process the associated insurance claim.  Public adjusters also compete to sign projects by approaching the property owner, and, in turn, make referrals to the property owner for EMS companies.  Based upon state licensing requirements, public adjusters cannot solicit work from

property owners overnight.  EMS companies can solicit work from property owners at any time, including after business hours and overnight.

**B.**       **The Enterprise**

The Government expects that the evidence at trial—including testimony from multiple lay and cooperating witnesses, wiretap interceptions, phone communications and content, surveillance video, and financial records—will show that Jatiek Smith ("Smith") was hired by First Response Cleaning Corp., a Brooklyn-based EMS company, in approximately October 2019.  Although not the owner of First Response, Smith eventually assumed control over the company's business, its ongoing activities, its hiring decisions, and its finances.  Smith, a self-identified and high-ranking member of the Bloods gang (specifically, the Tombstone Gangsta or "TSG" set), hired other Bloods members who reported to him to work for First Response.  Smith and his subordinates formed an enterprise that extorted and assaulted competitors in the fire restoration industry (the "First Response Enterprise" or "Enterprise"), including competitors who operated or were based in the Southern District of New York.

The First Response Enterprise embarked upon a sustained course of violence and intimidation, including through establishing a system of rules that competitors were required to follow, assaulting competitors who violated the Enterprise's rules, and extorting payments from competitors.  Over the course of the Enterprise's existence, its members and associates, led by Smith, engaged in extortion of other industry members, wire fraud through a scheme to defraud insurance companies and further enrich First Response, and obstruction of justice and witness tampering by tampering with witnesses in an effort to hamper the federal investigation that led to the Indictment in this case.

### 1.   *The Rotation System, The Enterprise's Rules, and Extortionate Payments*

As the evidence at trial will establish, in approximately mid-2020, the Enterprise pushed out its leading competitor ("Company-1") through violence, threats of violence, and extortionate demands.  Smith attacked Company-1's managers, threatened its workers, and ultimately drove Company-1 out of business.  Smith demanded $100,000 from its main rival, Company-1, to allow them to come to any fires.

After successfully eliminating its main competitor, the defendants then imposed rules on other participants in the fire restoration industry and threatened other EMS companies and public adjusters with violent assaults if they did not obey the directives of the Enterprise.  Under First Response's industry rules, which changed over time, First Response generally demanded all nighttime fires at the beginning of the month.  After First Response had obtained some set number of fires (approximately 10 or 11 fires), Smith allowed other EMS companies to sign night fires but only with his permission.  For jobs that did not have to go to First Response, First Response, under Smith's direction, decided which public adjuster and which EMS company were allowed to sign any particular fire loss.  Smith later exerted control over daytime fires, as well, similarly determining who was permitted to sign fires.  This system of rules was enforced with public displays of violence and threats of violence, as detailed below, *see infra* §II.B.2, designed to intimidate industry participants into compliance.

The Government intends to offer evidence, including witness testimony and financial records, establishing that EMS companies and public adjusters had to make extortionate payments to the Enterprise and/or its members in order to sign any fire loss, even the limited number of fires losses they were allowed to sign under First Response's rules.  Some victim EMS companies were required to make payments to the Enterprise, sometimes on a weekly basis, in order to be permitted to sign any fires.  One way the Enterprise received extortionate payments from EMS companies

was by having those companies make weekly salary payments to Enterprise members.  Other industry participants, including public adjusters, were required to pay a kickback to the Enterprise, usually representing some portion of the payment from the insurance company.

### 2.  *Use of Violence and Threats of Violence*

The defendants used threats of force, and on multiple occasions, actual violence, to extort victims, cement their control over the industry, and enforce the rules that they imposed.  Among the incidents of violence that the Government expects to prove are the following:

- On or about March 12, 2020, in Brooklyn, New York, after Sequan Jackson got into a verbal dispute with a public adjuster, an associate of First Response and Bloods member, directed by Smith, punched that public adjuster multiple times. The assault was recorded.

- On or about May 4, 2020, in Brooklyn, New York, after employees of Company-1 signed a loss, several associates of First Response assaulted Company-1's employees at the site of a fire.

- On or about May 5, 2020, in Queens, New York, in the early morning, several members of First Response, including Smith, assaulted the owner of Company-1 outside of Company-1's warehouse.  During the course of the assault, the owner was punched so hard that he fell to the ground.  The assault was captured on surveillance footage.

- On or about September 15, 2020, in Queens, New York, McGee, a First Response enterprise member, assaulted a public adjuster at Smith's direction.  The assault was in retaliation for the adjuster's firm not adhering to Smith's rules.  The public

adjuster was hospitalized for one night and suffered serious bodily injury, including a lost tooth and a brain bleed.

- On or about November 13, 2020, in Brooklyn, New York, McGee assaulted a public adjuster–who was still recovering from heart surgery—in retaliation for not signing up First Response for any mitigation work on a fire loss.  The public adjuster suffered facial injuries.  Pereira recorded a video of the assault.

- In or about the fall of 2020, in Brooklyn, New York, Jatiek Smith and other First Response members ordered one of Company-1's owners to meet them at a parking lot in Brooklyn, where Smith and members of the Enterprise confronted the owner, and McGee pistol whipped him in the face.

- On or about the morning of January 14, 2021, in Brooklyn, New York, Jackson assaulted a property owner, whose home had been damaged in a fire, after the property owner refused to sign the EMS company that Jackson directed.

- On or about the late evening of January 14, 2021, or early in the morning of January 15, 2021, in Brooklyn, New York, Smith, Dore, and other First Response members assaulted an employee of a rival EMS company based out of Manhattan ("Company-2"), because Company-2's employee signed up multiple fire losses against First Response's rules (in a situation where multiple properties were damaged by a single fire).  During the assault, Smith made various threats, such as, in substance, "I got 13-year-old kids out here looking to make a name for themselves, I'll give them a gun, they can kill you or your family."

- On or about April 5, 2021, in Queens, New York, Enterprise member Kaheen Small punched an industry participant who had signed a loss in Queens in contravention of First Response's rules.

- On or about May 24, 2021, in Queens, New York, a public adjuster, along with his employee, encountered numerous First Response members, including Smith and Jackson, after being summoned to the scene of a fire.  Smith restrained the public adjuster's employee by placing him in a headlock, made threats (including threats that referenced Smith's gang membership) against the adjuster's family, and demanded a kickback of the adjuster's fee for a particular fire.   During this encounter, Smith proceeded to take off his chain and shirt and asked if the public adjuster was afraid.

- On or about September 7, 2021, Small, at Smith's direction, assaulted a public adjuster at the site of a fire in Brooklyn for refusing to follow the rotation system as directed by Smith and Jackson.

- On or about October 18, 2021, in Staten Island, New York, First Response members and associates, including Smith, Jackson, Damon Dore, Rahmiek Lacewell, and Hasim Smith, participated in the assault of a construction worker who was perceived to have disrespected the Enterprise and Smith.  After the worker was assaulted, the assailants took a photograph of his driver's license as a threat.

The Enterprise's use of violence shared various common elements designed to heighten the fear of its victims.  The violence and threats were directed at employees and owners of EMS companies, public adjusters, or other industry participants (such as construction workers or subcontractors) in public settings or in recorded videos.  Members of the Enterprise made video

recordings of particular acts of violence and circulated such recordings among industry participants in order to demonstrate their willingness to use violence and to threaten other potential victims, further cementing the Enterprise's control.

Furthermore, in threatening violence, members of the Enterprise—particularly Smith—often advertised their membership in the Bloods. Smith often described to victims that he was a member of the Bloods or provided his gang nickname of "Bad Blood." Smith made veiled threats of retaliation that, in substance and in part, victims should be afraid of provoking or challenging his authority because of his gang affiliation. The defendants' membership in the Bloods and particularly, Smith's status as a high-ranking TSG gang member, also allowed them to deploy Bloods members to carry out violence against other industry participants.

The Enterprise made threats involving guns and including threats of violence against the family members of their victims. The Government also intends to offer into evidence that the Enterprise maintained possession of numerous firearms, including four firearms recovered from the basement of First Response's Staten Island office and two firearms recovered from Jackson's apartment on the day of the arrest.

### 3. *Acts Involving Mail and Wire Fraud*

Payments on losses caused by fire damage are typically paid by a homeowner's insurance carrier. Certain conditions at a loss, including for example, illegal stoves or kitchens, can render a property ineligible for insurance coverage. Where feasible, First Response's cleanup crew and technicians removed and attempted to remove those disqualifying features from fire sites that could render a loss uninsurable, knowing that false information about the property would then be conveyed to insurance companies for purposes of obtaining insurance payouts. The Enterprise also partnered with a corrupt public adjuster and Enterprise member Octavio Peralta to ensure insurance coverage on a loss through misrepresentations.

8

### 4.  *Witness Tampering and Obstruction of Justice*

The Government intends to introduce evidence that, after Smith learned that he was under a federal grand jury investigation in approximately November 2021, Smith and other Enterprise members made several efforts to obstruct justice and tamper with witnesses.  For example, in November 2021, Smith hosted a dinner at an Italian restaurant in Staten Island that was attended by other Enterprise members, including Jackson and Dore, as well as by public adjusters and EMS company owners.  There, Smith toasted a witness who had been approached by the FBI for not disclosing information to the FBI.  Smith toasted this individual in full view of the other guests— who were themselves industry participants and witnesses or potential witnesses to the ongoing investigation.  In addition, Smith probed whether at least one witness was cooperating with the FBI and threatened that witness in an effort to deter that witness from cooperating with the investigation.

Prior to his arrest, in approximately May 2022, Smith convened a meeting of employees and/or owners of various EMS companies and public adjusters in a parking lot in Brooklyn.  The meeting was attended by Enterprise members Jackson and McGee.  During the meeting, Smith indicated that he knew of the federal investigation and that he would kill the attendees and take them down with him if they cooperated.

## III.  THE PROFFERED EVIDENCE IS ADMISSIBLE AS DIRECT EVIDENCE OF THE RACKETEERING ACTIVITY, ENTERPRISE, AND CONSPIRACY, AND AS PROOF OF MOTIVE

Evidence of the acts described above (collectively, the "Proffered Evidence"), *see supra* § II.B, is admissible as proof of, among other things: the nature and existence of the Enterprise, the pattern of racketeering activity engaged in by the defendants and their co-conspirators, the acts

of violence committed by the defendants, and the motives that drove the defendants and co-conspirators to engage in the criminal activities discussed above.

Count One charges the defendants with participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).  In order for the Government to meet its burden with respect to this count, the Government need not prove that the defendants committed any particular racketeering acts.  Rather, the Government must prove "that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity."  *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (citing *United States v. Glecier*, 923 F.2d 496, 499-500 (7th Cir. 1991)); *see also United States v. D'Amico*, 734 F. Supp. 2d 321, 331-32 (S.D.N.Y. 2010).

The Second Circuit has repeatedly held that evidence of criminal acts committed by co-conspirators in the racketeering enterprise is admissible to prove the existence of the racketeering enterprise and a pattern of racketeering activity, and as background of the conspiracy charged.  *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 244-45 (2d Cir. 2012); *United States v. Payne*, 591 F.3d 46, 64 (2d Cir. 2010); *United States v. Mejia*, 545 F.3d 179, 206-07 (2d Cir. 2008).  "Such conduct is not 'other' crime evidence subject to Fed. R. Evid. 404(b); rather, it is evidence of the very racketeering crimes charged."  *Coppola*, 671 F.3d at 245; *see, e.g.*, *United States v. Matera*, 489 F.3d 115 (2d Cir. 2007) (referencing "numerous prior rulings of this court in which *criminal acts of non-defendants, including killings*, were received to prove the existence of the criminal RICO enterprise in which the defendant participated" (emphasis added)).  Moreover, violent acts that may begin as personal disputes may evolve into racketeering acts when another enterprise member joins to help a fellow member.  *See United States v. Vernace*, 811 F.3d 609, 617-18 (2d Cir. 2016).  Accordingly, such evidence is "routinely admitted" as proof of charged racketeering

offenses. *United States v. Boyle*, 2009 WL 5178525, at *6 (S.D.N.Y. Dec. 23, 2009). Evidence of criminal acts committed by co-conspirators in the racketeering conspiracy is admissible to "'inform the jury of the background of the conspiracy charged,'" "to complete the story of the crimes charged," and to "help[] explain to the jury how the illegal relationship between [participants in the crime] developed.'" *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (quoting *United States v. Brennan*, 798 F.2d 581, 589-90 (2d Cir. 1986), and *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir. 1984)); *see also United States v. Diaz*, 176 76 F.3d 52, 79-80 (2d. Cir 1999).

The Proffered Evidence is admissible as proof of core elements of the charged offenses, including the nature and existence of the Enterprise, and the co-conspirators' pattern of racketeering activity.  The Government must establish, among other things, that (a) the charged racketeering enterprise existed; and (b) each defendant engaged in a "pattern of racketeering activity" or agreed that the enterprise would be operated through such a pattern.  18 U.S.C. § 1962(c), (d).  Evidence relating to these issues will be intertwined at trial, as evidence of "the nature of the enterprise" can "prove the relatedness and continuity essential to a pattern, thereby helping to establish 'that [a] defendant's own acts constitute a pattern within the meaning of RICO.'" *United States v. Basciano*, 599 F.3d 184, 207 (2d Cir. 2010) (quoting *United States v. Indelicato*, 954 F.2d 1370, 1383 (2d Cir. 1989) (en banc)); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) (reasoning that, although enterprise and pattern are distinct elements of racketeering, evidence proving these elements "may in particular cases coalesce").  Specifically, evidence of acts of violence and threats of violence, extortion, wire fraud, mail fraud, witness tampering, and obstruction of justice are all part of the charged offense and have significant probative value.  Evidence of these acts demonstrates that the purposes of the Enterprise included

enriching members of the Enterprise through extortion, preserving and protecting the power of the Enterprise and its leader, Smith, through violence, and protecting the Enterprise and its members from detection and prosecution.  Moreover, evidence of acts of violence committed at Smith's direction illustrate his power and control over the Enterprise, and his position as the leader of the Enterprise.

In addition—to the extent any evidence is considered proof of prior crimes or not itself part of the charged offense—the Proffered Evidence is not truly "other crime" evidence under Rule 404(b).  Instead, the Proffered Evidence is inextricably intertwined with the Government's proof for both the racketeering conspiracy charged in Count One and the extortion conspiracy charged in Count Two, because it provides background regarding the Enterprise, completes the story of the Enterprise, and places the defendants' conduct in an understandable context for the jury.  The Proffered Evidence illustrates the origin and evolution of the Enterprise, the extent and scope of the Enterprise, the development of the illegal relationships among the co-conspirators, the mutual trust between them, and the ways in which the members of the Enterprise sought to maintain and enhance the power of the Enterprise.  For example, certain assaults were carried out by uncharged co-conspirators, including the March 12, 2020 assault and the January 14, 2021 assault described above.  These co-conspirators were acting at Smith's direction or under his supervision, such that their conduct directly proves Smith's leadership of the enterprise and is inextricably intertwined with the defendants' conduct.  In addition, these co-conspirators were enforcing Smith's rules for the industry and enhancing the power of the Enterprise, such that their participation in the racketeering conspiracy completes the story of the Enterprise.

Furthermore, the Proffered Evidence should not be excluded based on the balancing required by Rule 403.  The evidence is highly probative of core elements of the charged offenses,

which will be disputed at trial. *See, e.g.*, *Coppola*, 671 F.3d 220 at 245 (affirming determination that "the highly probative value of the challenged evidence to prove enterprise and pattern outweighed the risk of unfair prejudice"). There is no unfair prejudice given that the nature of the evidence is similar in kind to the evidence of the charged racketeering and extortion conspiracies. *See*, *e.g.*, *Coppola*, 671 F.3d 220 at 245-46 ("[T]he risk of unfair prejudice was not high in this case because the challenged evidence . . . is not 'especially worse or [more] shocking' than the activity charged. . . ." (internal quotation marks omitted)); *United States v. Quinones*, 511 F.3d 289, 310 (2d Cir. 2007) (evidence of threats to informants not unduly prejudicial because it was "no more inflammatory than the charged murder itself"). Finally, the Proffered Evidence will not be cumulative or confusing. The evidence at issue relates to discrete instances of criminal conduct by the defendants and co-conspirators, which are straightforward and will be relatively easy for the jury to understand. *Cf. United States v. DiNome*, 954 F.2d 839, 842 (2d Cir. 1992) (no danger of confusion where criminal acts were "rather ordinary in nature, except in their viciousness"). Therefore, for all of these reasons, the Proffered Evidence should not be excluded under Rule 403.

## IV.   THE COURT SHOULD PERMIT REFERENCES TO THE DEFENDANTS' BLOODS MEMBERSHIP

As described above, the Government intends to introduce evidence that several members of the Enterprise, including Smith, Jackson, McGee, Lacewell, and Hasim Smith, were members of the Bloods and that their expressed gang affiliation featured heavily in their intimidation and threats to other industry participants. Given the nature of the threats, evidence of the defendants' gang affiliation is inextricably intertwined with the offense conduct to be proven at trial.

### A.   Applicable Law

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." Relevant evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997). In fact, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; accord *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also Quinones*, 511 F.3d at 309; *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003). Even where such evidence is not admissible as direct evidence, it may still be admissible pursuant to Rule 404(b), for certain non-propensity purposes, such as motive, opportunity, intent, and knowledge. Fed. R. Evid. 404(b). This Court "follows an inclusionary approach to the admission of other act evidence," so that "evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. LaSanta*, 978 F.2d 1300, 1307 (2d Cir. 1992).

Any evidence must also satisfy Rule 403, which provides, in part, that evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The touchstone of the prejudice analysis is whether the proffered evidence does "not involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *Roldan-Zapata*, 916 F.2d at 804.

14

###### B.        Discussion

Evidence that the defendants used their association with the Bloods to extort the fire restoration industry is direct evidence of the charged crimes: it is closely intertwined with the offense conduct, arises out of the same transaction or series of transactions as the charged offenses, and is necessary to complete the story of the crimes on trial.

For example, in approximately June 2020, Smith recorded an incident where he threatened various employees and the owner of an EMS company.  During this recording, Smith threatened to kill the children of an employee of this particular EMS company, and repeatedly threatened to kill anyone who failed to abide by his rules.  Smith stated, in part: "Who the fuck ya'll n*****️ think y'all playing with?  I'm not a sucker.  Y'all n*****️ think this fire chasing business is something.  I'm a gang member.  I've been gang banging for years.  I'll kill one of you n****s to send a message.  That's the messages I send, man."  The EMS company that was subjected to these threats ultimately made regular extortionate payments to Smith.  Other witnesses will describe similar incidents in which Smith proclaimed his gang membership and leadership—including his gang name, "Bad Blood"—to intimidate them.

That Smith deployed his gang affiliation to control the industry was explicitly confirmed in an interview conducted by law enforcement in or about November 2021.  After Smith learned of the federal investigation, he called one of the Government's case agents ("Agent-1") and asked for a meeting.  On November 11, 2021, Smith then sat down with Agent-1 for a voluntary and recorded interview.  In that interview, Smith readily admitted that he was member of the Bloods, stating: "I've been fucking arrested a million times for being Blood."  He further posited that his Bloods membership caused industry participants to take him seriously and back down from confronting Smith.

As witnesses will testify—and Smith's recordings will make plainly clear—Smith regularly referred to his gang name and his gang affiliation to cement the Enterprise's control over the industry and carry out acts of violence and extortion.  As the evidence will establish, the defendants advertised their gang membership to instill fear in industry participants and extort them of their property.  Their gang affiliation is thus inextricably intertwined with the threats, violence, and intimidation used in the racketeering and extortion conspiracies.

In addition, Smith's gang affiliation provides context for his relationship with his co-defendants and other co-conspirators.  Gang membership is properly admissible to "inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Diaz*, 176 F.3d at 79.  The evidence at trial will show that Smith was a leader of the TSG set, recruited fellow Bloods members to join the Enterprise (including Jackson, McGee, Hasim, and Lacewell), and entrusted gang affiliates to carry out violence and displays of force.

Finally, the gang evidence is not barred by Rule 403.  The fact of the defendants' gang affiliation is no more inflammatory than the charged offenses, where the defendants are accused of using violence, including firearms, to extort participants in the fire restoration industry.  Indeed, the trial will include evidence that the defendants perpetrated nearly a dozen acts of violence against industry participants and homeowners to exert control over the industry and enrich themselves.  Evidence of the defendants' gang membership is therefore no more sensational or disturbing that these numerous acts of violence.  *Roldan-Zapata*, 916 F.2d at 804.

## V.   THE COURT SHOULD ADMIT BRIEF REFERENCES TO SMITH'S PRIOR AND CURRENT INCARCERATION

### A.   Relevant Facts

The Government expects to introduce brief testimony about Jatiek Smith's own statements in which he referenced his prior incarceration.  For example, the Government expects Owner-1 to testify that when Smith was working with Owner-1 (and prior to Smith learning of the investigation in this case), Smith told Owner-1 stories about having all his teeth stomped out while he was incarcerated and about an incident in which he used a mattress to prevent correction officers from forcibly removing him from his cell.  Owner-1 will testify that Smith's demeanor was amused while narrating the stories, which, particularly when contrasted with the violence of the subject matter, was very intimidating to Owner-1 because it suggested that Smith was comfortable with and willing to engage in violence.

The Government also intends to introduce certain evidence about Smith's efforts to obstruct justice while at the MDC awaiting trial.  Among other evidence, the Government expects to call an MDC employee to testify about the seizure of a contraband phone from the defendant's cell.  The Government also expects to introduce evidence of communications between Smith and co-defendants about crimes the Enterprise committed, proceeds the Enterprise enjoyed, and Smith's efforts to bring his co-defendants into line with him.

### B.   Applicable Law

Courts often admit relevant evidence that reveals that the defendant has previously been incarcerated, noting that occasional and brief references do not cause significant prejudice.  *See, e.g.*, *United States v. Estevez*, 16 Cr. 307 (CM), 2017 WL 700775, at *5 (S.D.N.Y. Feb. 16, 2017) (collecting cases on admissibility of defendant's recorded prison calls); *United States v. Johnson*, 624 F.3d 815, 820–22 (7th Cir. 2010) (distinguishing between "much diminished" prejudice with

17

"occasional reference to the fact that [the defendant] had at some point been in jail" from significant prejudice caused when a defendant wears prison clothes during trial); *see also United States v. Owens*, 445 F. App'x 209, 218-19 (11th Cir. 2011) (also noting that a limiting instruction to the jury can "mitigate[] any potential prejudice").

### C.    Discussion

Evidence about how Smith described his prior incarceration is highly probative, directly related to the events alleged in the Indictment, and not unduly prejudicial.  While Owner-1 was a co-conspirator with respect to the extortion conspiracy, Owner-1 was a victim with respect to Smith's obstruction and witness tampering.  Smith's prior threats to Owner-1 are critical context for understanding Smith's later attempts to intimidate Owner-1 once Smith learned of the investigation.  Smith's relating of the violence he committed while incarcerated is thus inextricably intertwined with the threats and intimidation which constitute the narrative at trial.  For that reason, it should be admitted.  *See, e.g.*, *Coonan*, 938 at 1561 (2d Cir. 1991) (noting that a trial court "may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

The communications found on the cellphone Smith possessed in the MDC are relevant evidence showing his continued efforts to obstruct justice and tamper with witnesses.  The fact of Smith's incarceration is critical context for the communications, given that he was regularly requesting others take steps on his behalf in order to contact and intimidate witnesses.  To omit reference to Smith's incarcerated status could result in the misleading impression that the defendant was turning to others to carry out conduct that he was unwilling to personally undertake.

18

It would also make it difficult or impossible for the Government to explain the authenticity and context for the communications on the cellphone found in his cell.[1]

Additionally, in light of the nature of the allegations in the Indictment, which include violence and extortion, it is clear that, under Rule 403, references to incarceration would not be unduly prejudicial or distracting. Brief testimony about the defendant's own statements referencing his prior incarceration is neither more disturbing nor more sensational than the subject of the trial. *See Roldan-Zapata*, 916 F.2d at 804. Any potential prejudice can be addressed with an appropriate limiting instruction about the purpose for which the evidence is being introduced. Accordingly, the Court should allow its admission.

## VI.   THE COURT SHOULD ADMIT CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE CONSPIRACY UNDER RULE 801(d)(2)(E)

The Government intends to introduce—through witness testimony, intercepted phone communications, audio and video recordings, and text messages—statements made by other members of the racketeering and extortion conspiracies charged in the Indictment. The

---

[1] The Government would have no objection to a limiting instruction regarding how the jury should consider any brief mention of incarceration. *See, e.g., United States v. Mack et al.*, 18 Cr. 834 (PAE) (Judge Engelmayer, in similar circumstances, instructed the jury that: "Evidence of Mr. Mack's presence in jail is being received solely to explain his whereabouts at the time of these calls. You are not to consider that evidence for any other purpose. Specifically, you are not to consider that Mr. Mack was incarcerated in your deliberations. This is simply context to explain the circumstances under which the calls came about."). The law recognizes a strong presumption that a jury follows limiting instructions. *See Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) ("'[J]uries are presumed to follow their instructions.'" (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987))); *Spencer v. Texas*, 385 U.S. 554, 562 (1967) ("[T]he jury is expected to follow instructions in limiting . . . evidence to its proper function."); *accord United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006) (noting the "well-settled proposition" that jurors are presumed to follow limiting instructions).

Case 1:22-cr-00352-JSR   Document 201   Filed 04/17/23   Page 23 of 40

Government offers these as co-conspirator statements admissible under Federal Rule of Evidence 801(d)(2)(E).

### A.    Relevant Facts

The Government expects its proof will include witness testimony from victims about statements made by Enterprise members other than those proceeding to trial, including statements made by co-defendants who pleaded guilty and other co-conspirators who were acting in furtherance of the conspiracy as they made statements to the victims.[2]

For example, one victim ("Victim-1"), a public adjuster, is expected to testify about an interaction immediately prior to his assault on November 13, 2020.  A First Response employee, whom Victim-1 cannot identify, was wearing a red jacket with a First Response logo ("CC-1"), approached the victim stated, in substance, that the victim had to hire an EMS company as directed by First Response.  After Victim-1 indicated that there was no need for an EMS company, the same First Response employee then handed the victim a phone on which "Tiek" —*i.e.*, Jatiek Smith—was on the line.  While Victim-1 is unable to identify CC-1, he will describe him as a male wearing a red jacket with a First Response logo who directed him to hire a certain EMS company, and when he refused, to get on a phone call with Smith.

Victim-1 is also expected to testify about an interaction with numerous First Response employees at the scene of a fire in approximately April 2021.  Victim-1 is expected to testify about how, on that occasion, numerous First Response employees arrived after a public adjuster and the owner of a different EMS company ("Company-2") arrived at the same scene.  First Response

---

[2] Some of these statements are also admissible under Rule 801(d)(2)(D), as they were made by the defendants' "agent or employee on a matter within the scope of that relationship while it existed." Fed. R. Evid. 802(d)(2)(D).

employees swarmed the location and directed the owner of Company-2 to relinquish the job to First Response.  During this interaction, Victim-1 approached Smith and the owner of First Response ("Owner-1").  Victim-1 asked to speak with Owner-1 because of their history together. In a manner that Victim-1 perceived as threatening, Smith responded by saying, in substance, that he did not take direction from anyone.  Owner-1 then indicated, in substance, that "Smith was the boss now."

Another victim ("Victim-2"), who was assaulted by Kaheen Small on April 5, 2021, is expected to testify that he worked for a rival EMS company.  Victim-2 signed a loss and was approached by an unknown individual ("CC-2"), who was wearing a sweatshirt of a company within the rotation system, and was told, in sum and substance, "Don't you know that First Response runs the street."  CC-2 then demanded that Victim-2 "speak to the boss," which Victim-2 refused to do.  Shortly thereafter, Small assaulted Victim-2.

## B.    Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).  "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).

When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). The conspiracy in furtherance of which the statement was made does not have to be the conspiracy charged in the indictment. *See Gigante*, 166 F.3d at 82 ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment.").

To be "in furtherance" of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, for example: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *Diaz*, 176 F.3d at 87; or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785,

813 (2d Cir. 1994); *see also Desena*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

To be in furtherance of a conspiracy, "the statements must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Maldonado-Rivera*, 922 F.2d at 958. Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator." *Gupta*, 747 F.3d at 124.

### C.    Discussion

At trial, the Government intends to introduce statements made by co-conspirators in furtherance of their conspiracies with the defendants. These co-conspirator statements, including the examples provided above, are admissible against the defendants under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The statements identified above, and others like them, were made by declarants who were co-conspirators with the defendants and in furtherance of the conspiracies with which they have been charged. In the alternative, the Government would seek to admit these statements not for their underlying truth, but for the effect on the listener, specifically, to establish that victims were placed in actual fear of harm, with an appropriate limiting instruction, if requested by the defense.

For example, the unidentified co-conspirators, CC-1 and CC-2, who spoke to Victim-1 and Victim-2, respectively, just prior to those victims' assaults, assisted the defendants in enforcing the rules that the enterprise imposed on the industry, including by communicating the rules to victims who were perceived to be violating them. Their statements were in furtherance of defendants' efforts to intimidate victims and to maintain their control. *See United States v. Rivera*,

22 F.3d 430, 436 (2d Cir. 1994) (statements admissible if "designed to promote or facilitate achievement of the goals of the conspiracy").

Likewise, Owner-1's statements to Victim-1 were made at a time when Owner-1's was complicit in and a co-conspirator with the defendants' extortion conspiracy. Indeed, the Government intends to introduce additional evidence, including text messages between the defendant Smith and Owner-1, establishing that at the time of Owner-1's statements to Victim-1, Owner-1 was a member of the conspiracy. In this instance, Owner-1's statement in response to Victim-1's request for help functioned to re-enforce Smith's dominance, including in front of an industry competitor, in the course of an intimidating display. Owner-1's statement was thus in furtherance of the extortion conspiracy because it reflected a united front among the members of First Response and encouraged Victim-1 to give in to Smith's demands.

The statements outlined above, and others like them, were made, among other reasons, to enforce dominance over the Enterprise's extortion victims and ensure that those victims understood the rules that the Enterprise had imposed on the industry. The statements described above, and others like them, furthered the Enterprise's efforts to impose its own sets of rules on the industry, which were backed by threats of violence and actual violence. As discussed above, other statements by declarant co-conspirators functioned to keep victims and other co-conspirators apprised of the Enterprise's ongoing grip on the fire restoration industry. For example, CC-2's statement, "Don't you know that First Response runs the streets," informed Victim-2 of First Response's control of the industry. *See Maldonado-Rivera*, 922 F.2d at 958 (To be in furtherance of a conspiracy, "the statements must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal

activity.").  Therefore, all of these statements, and any other similar statements, are subject to the

hearsay exception in Rule 801(d)(2)(E).

## VII.    THE COURT SHOULD PRECLUDE EVIDENCE ABOUT EARLIER NON-FIRST RESPONSE INDUSTRY VIOLENCE AS IRRELEVANT

The defendants should be precluded from offering evidence or making arguments about

intimidation tactics that may have been used by other industry participants before the beginning of

the charged conspiracy.  Any such evidence or argument is not relevant to any issue to be decided

by the jury, *see* Fed. R. Evid. 401, and any potential probative value is substantially outweighed

by a danger of confusing the issues and misleading the jury, *see* Fed. R. Evid. 403.

Based on various statements by defense counsel, it appears that the defendants may seek

to present evidence suggesting that other industry participants were involved in intimidation of

competitors before the defendants entered the industry in 2019.  (*See, e.g.*, Tr. of Bail Hr'g on Nov.

4, 2022)).  In one of his bail motions, Jatiek Smith attached numerous text messages, including

messages that substantially predate his hiring at First Response.  Smith's motion stated that it was

"illuminating to highlight the atmosphere of the fire restoration industry" before Smith began

working there in the fall of 2019—including an alleged assault against Sequan Jackson that

"precedes Mr. Smith by four years"—and that these incidents "show the violence that was going

on within the industry" before Smith arrived.  *See* ECF No. 87, Oct. 26, 2022 Ltr. at 3.

Even assuming *arguendo* that there was evidence to support such claims, any such

evidence would have no legal bearing as to the offenses with which the defendants are charged.  If

other individuals engaged in violent conduct prior to the defendants' arrival into the industry, that

violence is no defense to the defendants later engaging in the same criminal conduct themselves.

The jury need not find that these defendants were the only members of the fire restoration industry

to commit violence, or even that they were the worst perpetrators.  Alleged violence committed by

other members of the industry before the charged conspiracy even existed is legally irrelevant, would distract the jury, and would require a series of trials-within-the-trial about supposed violence committed years ago by people who are not even charged and which occurred outside the period alleged in the indictment.  *See* Fed. R. Evid. 402 (irrelevant evidence is not admissible); Fed. R. Evid. 403 (evidence is not admissible where the risk of unfair prejudice substantially outweighs any probative value of such evidence).  Accordingly, the defendants should be precluded from offering any evidence of alleged violence committed by other members of the industry before the time period of the alleged conspiracy.

In addition to its legal irrelevance, arguments concerning violence that predated the charged conspiracies would invite jury nullification, by suggesting that there are other bad actors in the industry who committed violence in the same manner as the defendants.  In other words, such arguments invite the jury to acquit not based on a lack of evidence, but based on sympathy.  *See United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (this court "categorically reject[s] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent [it].").

## VIII.   THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE DEFENDANTS WERE SELECTIVELY PROSECUTED

The Court should further preclude the defendants from raising the related defense that the Government is selectively prosecuting the defendants, and not prosecuting other industry participants who engaged in violence.

Here, Smith sought to dismiss the Indictment due to vindictive and selective prosecution— and lost.  *See* ECF No. 183.  That failed challenge was one "for the court rather than for the jury"— and should not be resurrected in arguments to the jury.  *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011); *see* Fed. R. Crim. P. 12(b)(3)(A)(iv) (listing, among pretrial motions, "a defect

in instituting the prosecution, including . . . selective or vindictive prosecution"). Based on these principles, courts have sustained objections or precluded defendants from arguing to the jury about the Government's motives. *See Farhane*, 634 F.3d. at 166-67 (affirming a sustained objection to a defense closing argument that "the government had targeted him for prosecution based on his religion"); *United States v. Duncan*, No. 18 Cr. 289 (SHS), 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019) ("[T]o the extent Locust seeks to highlight the fact that he was not a target of the investigation to suggest that the government's true targets were the doctors and lawyers allegedly involved in the conspiracy and to draw attention to their absence from this case, the Court has already ruled that such argument is improper."). Accordingly, the Court should preclude the defense from offering evidence or argument—which would be wholly untrue—that the Government is selectively or vindictively prosecuting the defendants.

## IX.  THE COURT SHOULD LIMIT THE SCOPE OF CROSS-EXAMINATION FOR A VICTIM WITNESS.

The Government seeks to preclude cross-examination of a particular victim-witness ("Victim-3") based upon Victim-3's prior drug use and several criminal convictions that occurred between 1994 and 2011—none of which involve crimes of dishonesty or false statements. These topics do not bear on credibility of Victim-3 are inflammatory.[3]

### A.    Applicable Law

Rule 611 of the Federal Rules of Evidence provides that a court should "protect witnesses from harassment or undue embarrassment," and that cross-examination "should not go beyond the

---

[3]  The Government conferred with defense counsel prior to filing this motion and understands that defense counsel has agreed to not cross examine: (1) a particular cooperating witness ("CW-1") on CW-1's online communications with an individual identifying as a minor; and (2) a particular victim concerning allegations of domestic violence.

subject matter of the direct examination and matters affecting the witness's credibility." Fed. R.

Evid. 611.  As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation
> Clause is concerned to impose reasonable limits on such cross-
> examination [of a prosecution witness] based on concerns about,
> among other things, harassment, prejudice, confusion of the issues,
> the witness' safety, or interrogation that is repetitive or only
> marginally relevant. . . . [T]he Confrontation Clause guarantees an
> opportunity for effective cross-examination, not cross-examination
> that is effective in whatever way, and to whatever extent, the defense
> might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted).  Thus,

under Rule 611(b), "[c]ross-examination should be limited to the subject matter of the direct

examination and matters affecting the credibility of the witness." *United States v. Rivera*, 971 F.2d

876, 886 (2d Cir. 1992) (quoting Fed. R. Evid. 611(b) (emphasis in *Rivera*)).

Rule 608(b) establishes the test for impeachment by evidence of specific instances of past

conduct.  The Rule provides that such instances may be inquired into on cross-examination "if

they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2)

another witness whose character the witness being cross-examined has testified about."  Fed. R.

Evid. 608(b).  Rule 608(b) also provides that "[e]xcept for a criminal conviction under Rule 609,

extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to

attack or support the witness's character for truthfulness."  The Court "may, on cross-examination,

allow [those prior acts] to be inquired into," but only if such acts "are probative of the character

for truthfulness or untruthfulness of . . . the witness."  Fed. R. Evid. 608(b)(1).

With respect to prior convictions, Rule 609(a)(1) provides that evidence of a witness's prior

felony conviction "must be admitted, subject to Rule 403."  *See United States v. Estrada*, 430 F.3d

606, 617 (2d Cir. 2005) ("Rule 609(a)(1) presumes that all felonies are at least somewhat probative

of a witness's propensity to testify truthfully.").  And evidence of any conviction, regardless of whether it is a felony, is admissible if it involved a crime of dishonesty or false statement.  *See* Fed. R. Evid. 609(a)(2) (evidence of a prior conviction "must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement").  However, there is a time restriction: "[I]f more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later[,] [e]vidence of the conviction is admissible only if . . . its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b).  The Second Circuit "ha[s] repeatedly 'recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances.'" *Farganis v. Montgomery*, 397 F. App'x 666, 669 (2d Cir. 2010) (quoting *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993)).

Any cross-examination also must satisfy Rule 403—that is, specific instances of a witness's prior conduct may be inquired into on cross-examination only if the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995).  Thus, courts in this Circuit have repeatedly barred cross-examination regarding violent conduct that has no bearing on a witness's credibility.  *See, e.g.*, *United States v. Jeffers*, 402 F. App'x 601, 603 (2d Cir. 2010) (affirming preclusion of cross-examination of cooperating witness regarding prior acts of domestic violence based on "determination that the purported prior acts of violence were not probative of [the witness's] credibility"); *Flaharty*, 295 F.3d at191 (2d Cir. 2002) (affirming preclusion of cross-examination of cooperating witness regarding his role in a murder because the "murder was not relevant to [the witness's] credibility," and noting that

"there was ample other material through which defendants could test his credibility and expose any bias"); *Estrada*, 430 F.3d at 621 (noting that "crimes of violence . . . may bear so marginally on honesty or veracity, depending on the circumstances of those crimes, as to justify exclusion [even] under [the less exacting standard of] Rule 609(a)(1)."); *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (precluding cross-examination regarding witness's prior arrests for allegedly assaulting his girlfriend, finding that "they do not involve instances of dishonesty or making false statements" and noting "the Second Circuit's inclination to preclude the discussion of a witness's prior commission of violent crimes because of such crimes' lack of relevance to the issue of the witness's veracity").

### B.    Discussion

Cross examination regarding Victim-3's past drug use and his prior criminal convictions should be precluded, as these topics are neither relevant nor probative of his character for truthfulness.

First, cross examination regarding Victim-3's past drug use and struggles with addiction should be precluded, as it is irrelevant, unfairly prejudicial, and has no bearing on his character for truthfulness. In meetings with the Government, Victim-3 disclosed that several years ago—and years prior to the beginning of the charged conspiracy—Victim-3 was addicted to opioids but that he got clean and has not used drugs in many years. Victim-3 did not use drugs during the period of the charged conspiracy and thus was not using drugs during any of the events about which he will provide testimony. Consequently, any cross examination regarding Victim-3's prior drug use serves only to embarrass him and is highly prejudicial, while being entirely irrelevant to the topics about which he will provide testimony.

Second, cross examination regarding Victim-3's past criminal convictions that occurred more than 10 years ago should similarly be precluded. Victim-3 has eight prior criminal

convictions for assault, attempted robbery, possession of contraband in prison, and petit larceny.

Victim-3 finished serving his sentences on all these convictions more than ten years ago, with the

exception of his 2011 conviction for attempted possession of contraband in prison in the first

degree, for which he was sentenced to 18 months to three years' imprisonment and was released

on October 25, 2013.  Cross examination on Victim-3's first seven convictions should be precluded

under Rule 609(b), as more than ten years have passed since the conviction or release and the

prejudicial effect of such cross significantly outweighs its probative value.  Assaults, petit larceny,

and attempted robbery that occurred while Victim-3 was struggling with opioid addiction many

years ago have no bearing on his testimony in this case and would only serve to prejudice the jury

against him.  Moreover, the fact that Victim-3 was convicted of assault more than a decade ago

has no relevance to the fact that Victim-3 was himself the victim of an assault in this case.  There

is no evidence here that Victim-3 engaged in any violent conduct during the charged conspiracy

or for many years prior to the charged conspiracy and any cross examination on his long-ago

convictions would be designed to improperly discredit him in the eyes of the jury.

Victim-3's most recent conviction—and his only sentence that extends into the past ten

years—should also be precluded, as a conviction for possessing contraband in prison similarly has

no relevance to his testimony in this matter, is highly prejudicial, has no bearing on his character

for truthfulness, and therefore serves no proper purpose.

## X.   THE COURT SHOULD ADMIT EVIDENCE OF SMITH'S CONDUCT AT THE TIME OF HIS ARREST AS CONSCIOUSNESS OF GUILT

The Government expects to offer proof in the form of law enforcement testimony that, on

the date of the defendant Jatiek Smith's arrest in Puerto Rico on or about June 28, 2022, he resisted

arrest and took steps to interfere with law enforcement's retrieval of his cellphones.  Specifically,

the Government expects one of the arresting agents to testify that when federal agents told Smith

that they had a federal warrant for his arrest, Smith refused to open the door. When Smith finally opened the door, Smith started yelling at the agents in a hostile manner and telling them that he was not going to let them arrest him. When the agents tried to place Smith under arrest, he swatted the agents away, and said that he was "not no bitch," that he "wasn't gonna let any of [the agents] arrest him," that that "you are going to have to kill me." Smith told one agent that "he would go down the deep end with all of us that were in the room" and that he was "going to take some of us down." Smith continued yelling and making threats, in a fighting stance, for about an hour. After approximately one hour, Smith finally appeared willing to comply—but then, when told that the agents had a warrant for his cellphones, Smith stopped complying and tried to break one of the phones. Smith then resumed his fighting stance and continued making hostile comments for another approximately 45 minutes. After a total of approximately one hour and forty-five minutes, the agents finally managed to place Smith under arrest and retrieve his cellphones.

## A. Applicable Law

It is "today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Steele*, 390 Fed. App'x 6, 12 n.2 (2d Cir. 2010) (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977). Furthermore, "it is the universal rule that attempts to suppress evidence of a crime are competent evidence of guilt." *United States v. Gottfried*, 165 F.2d 360, 363 (2d Cir. 1948); *see also United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) ("Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt."). Consciousness-of-guilt evidence is admissible if the [district] court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule

32

403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." *Perez*, 387 F.3d at 209.

### B.  Discussion

The Government respectfully submits that evidence of Smith's conduct at the time of his arrest is compelling proof of the defendant's consciousness of guilt.  Here, the defendant resisted arrest for over an hour, threatened to harm law enforcement in the process, and attempted to destroy his cellphones after learning federal agents had a warrant to search it.  Those cellphones contained numerous electronic files that constituted damning proof of the charged conduct, including videos of assaults, communications with co-conspirators, and communications with victims.  The obvious inference from the defendant's conduct is that he knew he was facing serious charges for the crimes he had knowingly committed and he wanted to prevent law enforcement from obtaining this powerful proof of his guilt—of which he was necessarily aware.  *See, e.g.*, *Hodgskin v. United States*, 279 F. 85, 93 (2d Cir. 1922) ("[T]he fact of destruction [of certain documents] was relevant to show a course of conduct on the part of [the defendant], showing a consciousness of guilt, in the sense of attempting to hide all evidence of communication between [co-conspirators].").  This same course of conduct also demonstrates that the defendant knew during the offense conduct that he was acting criminally.

This inference is only strengthened by the other evidence that the defendant was aware of the investigation into his conduct at the time of his arrest.  After learning of the investigation, he in fact spoke to law enforcement officers and demonstrated his awareness of the investigation and its focus on his conduct in the fire restoration industry.  Such background knowledge further supports the inference that his resisting arrest and attempted destruction of his phones at the time of the arrest demonstrated his consciousness of guilt with respect to these offenses.  For that reason,

the agent testimony regarding Smith's attempts to resist arrest and destroy evidence should be admitted to prove his consciousness of guilt.

## XI.   THE COURT SHOULD ADMIT, AS AN EXCITED UTTERANCE, A STATEMENT OF A VICTIM THAT WAS MADE TO A RESPONDING POLICE OFFICER.

The Government expects that testimony from other witnesses and other trial evidence will establish that several of the defendants committed an assault at a certain address in Staten Island on the afternoon of October 18, 2021.  The testimony will establish that a group of construction workers perceived to have shown disrespect to Smith were confronted, and one of the workers ("Victim-4") assaulted, by the defendants.   The Government seeks to introduce Victim-4's statement to the responding police officer as an excited utterance.

### A.   Applicable Law

An excited utterance is an exception to the hearsay rule, and available regardless of whether the declarant is available as a witness. See Fed. R. Evid. 803. The exception is "derived from the belief that contemporaneous statements about observed events leave less time to forget or fabricate and, therefore, tend to be reliable." *United States v. Gonzalez*, 764 F.3d 159, 169 (2d Cir. 2014).

Rule 803(2) provides that a declarant's out-of-court statements "relating to a startling event or condition, made while the declarant was under the stress of the excitement caused by the event or condition" are admissible. Fed. R. Evid. 803(2). The statement's proponent must demonstrate that (i) a startling event occurred; (ii) the statement was made while the declarant was under the stress of excitement caused by the startling event; and (iii) the declarant's statement relates to the startling event. *United States v. Brown*, 254 F.3d 454, 458 (2d Cir. 2001). An excited utterance "need not be contemporaneous with the startling event to be admissible." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (quotation omitted). Instead, "[t]he length of time between the event and the utterance is only one factor to be taken into account" *Id.* (quotation omitted)). The

critical question is simply whether the declarant was still under the stress caused by the event. *See United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998) (affirming admission of statement made three hours after startling event); *United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (admitting statement made 40 minutes after declarant and another person were shot, as "the excitement caused by having witnessed the murder of another individual and gotten shot himself had not dissipated").

### B.  Discussion

On October 18, 2021, NYPD officers responded to a 911 call at a location in Staten Island, New York.  Officers were dispatched the location, arrived within minutes, and one of the officers ("Officer-1") spoke immediately with a victim who had visible and recent injuries on his face ("Victim-4").  Officer-1 observed that Victim-4 appeared agitated and in shock.  Officer-1 also observed Victim-4's hand shaking as he retrieved his identification.  Amid these circumstances, Officer-1 is expected to testify that Victim-4 stated, in substance and in part, that "[o]ne of the guys took a picture of his ID."  The Government seeks to admit Officer-1's testimony about this statement by Victim-4 as an excited utterance.

As both the timeline of events and Victim-4's demeanor make clear, Victim-4 unquestionably was still under the stress of the event.  *See United States v. Lloyd*, 859 F.Supp.2d 387, 395 (E.D.N.Y. 2012) (admitting a 911 call as "an excited utterance in that it was made by a participant while under the stress of the obvious excitement caused by the robbery by men with guns" and concluding it was a present sense impression).  Victim-4's remark to Officer-1 about the fact that his assailants photographed his identification, which related to the startling assault that Victim-4 had just experienced and for which his injuries were still fresh, should be admitted.

35

XII.   **BUSINESS CERTIFICATIONS ARE APPROPRIATE TO ESTABLISH THE AUTHENTICITY OF CERTAIN BUSINESS RECORDS.**

The Government intends to introduce certain records at trial, such as bank records and records from Facebook.  These records are admissible as business records under Rule 803(6), and the Government intends to establish the proper foundation with an appropriate certification, rather than a custodian, under Rule 803(6)(D).  *See also* Rule 902(11) (evidence that is self-authenticating includes "original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court"); *United States v. Clotaire*, 963 F.3d 1288 (2d Cir. 2020).[4]

---

[4]   The parties are continuing to discuss stipulations on the authenticity of such records.

XIII.    **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the

Government's Motions *in limine* in their entirety.


Dated: New York, New York
        April 17, 2023


                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                                        By:____/s/_____
                                            Rushmi Bhaskaran
                                            Mollie Bracewell
                                            Elizabeth A. Espinosa
                                            Assistant United States Attorneys
                                            (212) 637-2247 / 2218 / 2216